Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/22/2016 09:07 AM CDT

In re Interest of Alan L., a child
under 18 years of age.
State of Nebraska, appellee,
v. Alan L., appellant.

___ N.W.2d ___

Filed July 22, 2016.    No. S-15-860.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.
2. **Judgments: Res Judicata.** Whether the doctrine of claim preclusion, or res judicata, bars relitigation of a claim presents a question of law.
3. **Constitutional Law: Due Process.** Whether the procedures given an individual comport with constitutional requirements for procedural due process presents a question of law.
4. **Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.
5. **Juvenile Courts: Probation and Parole.** Under Neb. Rev. Stat. § 43-286 (Cum. Supp. 2014), before a juvenile court can order a juvenile's placement at a youth rehabilitation and treatment center, the Office of Probation Administration must review and consider thoroughly what would be a reliable alternative to commitment at such a center. It must also provide a report to the court that supports one of the following conclusions: (1) there are untried conditions of probation or community-based services that have a reasonable possibility for success or (2) all levels of probation and options for community-based services have been studied thoroughly and none are feasible. The review should consider the success or failure of prior supervisory conditions, even if the conditions were imposed by some other agency responsible for the child's care.
6. **Juvenile Courts.** In considering whether the State has shown that a juvenile should be placed at a youth rehabilitation and treatment center,

a juvenile court is not required to repeat measures that were previously ineffective or unsuccessful.

7. **Juvenile Courts: Probation and Parole: Time.** Under Neb. Rev. Stat. § 43-286(1) (Cum. Supp. 2014), the State can file a motion to commit a juvenile to the Office of Juvenile Services for placement at a youth rehabilitation and treatment center at only three points in a delinquency proceeding: (1) before a court enters an original disposition, (2) before a court enters a new disposition following a new adjudication, or (3) before a court enters a new disposition following a motion to revoke probation or supervision.

8. **Appeal and Error.** Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.

9. **Juvenile Courts: Probation and Parole: Time.** Prospectively, a revocation motion is concurrently required even if the State is seeking a juvenile's commitment to the Office of Juvenile Services for probation violations.

10. **Judgments: Res Judicata.** Claim preclusion bars the relitigation of a claim that has been directly addressed or necessarily included in a former adjudication if (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) the former judgment was on the merits, and (4) the same parties or their privies were involved in both action.

11. **Res Judicata.** The doctrine of claim preclusion bars relitigation not only of those matters actually litigated, but also of those matters that a party could have litigated in the prior action.

12. **Juvenile Courts: Judgments: Time.** A juvenile court can compare the facts as they existed when it entered a previous order to new facts arising after that order to determine whether a change in circumstances warrants a different decision. This general principle applies when the State files successive motions to change a juvenile's disposition under Neb. Rev. Stat. § 43-286 (Cum. Supp. 2014).

Appeal from the Separate Juvenile Court of Sarpy County: Robert B. O'Neal, Judge. Affirmed.

Dennis P. Marks, Deputy Sarpy County Public Defender, for appellant.

Gary Brollier, Deputy Sarpy County Attorney, and Andrew T. Erickson, Senior Certified Law Student, for appellee.

Heavican, C.J., Wright, Connolly, Miller-Lerman, Cassel, Stacy, and Kelch, JJ.

Connolly, J.

## I. SUMMARY

Alan L. appeals from the juvenile court's August 2015 commitment order. That order committed him to the Office of Juvenile Services (OJS) for commitment at a youth rehabilitation and treatment center (YRTC). The court held two commitment hearings. In its first order, the court concluded that the evidence failed to support a commitment order. About 2 months later, the court found that the State had proved the necessary conditions for the commitment.

Alan argues that claim preclusion barred the State from presenting any new evidence at the second commitment hearing that was available to it before the first commitment hearing. He also contends that the commitment hearing violated his right to due process because he could not confront and cross-examine persons who provided adverse information against him. Finally, he contends that the State failed to produce sufficient evidence to show that all levels of probation supervision and community-based services had failed.

We affirm. We conclude that despite the State's failure to comply with our case law for seeking a new disposition or commitment to OJS, Alan was not deprived of his right to due process. We further conclude that new evidence at the second commitment hearing, which became available after the first hearing, showed a change of circumstances that justified the court's commitment order.

## II. BACKGROUND

Because Alan challenges the State's commitment procedures, it would be helpful for future cases to clarify the proper procedures under recent statutory amendments to the juvenile code. So we set out the procedures here with some detail.

Alan was born in September 1998. He was released from the YRTC on parole in the summer of 2014. In January 2015,

when Alan was age 16 and on parole, the county attorney's office filed a juvenile petition that alleged three counts of conduct constituting a misdemeanor offense. Alan admitted to being a minor in possession of alcohol, and the State dismissed the other charges.

Alan's parole officer reported that Alan had refused to cooperate with a chemical dependency evaluation, refused to charge his electronic monitor, and failed to attend school. His parole officer stated that she was authorized to seek a parole revocation but preferred to seek a disposition order placing him on probation. She believed that if Alan were sent back to the YRTC on probation, the State would have more supervision over him when he was released. After the hearing, the court adjudicated Alan under Neb. Rev. Stat. § 43-247(1) (Supp. 2013) (nontraffic misdemeanor or infraction), ordered a psychiatric evaluation, and scheduled a disposition hearing for March 26.

But in February 2015, new circumstances required the court to hold a detention hearing—not a disposition hearing. Following an altercation in his home, police officers took Alan into custody. A probation officer then placed Alan in secured detention at the Douglas County Youth Center because he posed an extreme risk to the community.

At the detention hearing, a probation officer testified about the altercation. Alan had demanded that his mother take him to his girlfriend's house, but she refused. Alan pushed her down and left the house angry but came back a few minutes later with a gun, which he allegedly held to her head. He then pointed the gun at his mother's boyfriend and demanded transportation, but the boyfriend refused.

After police officers took him into custody, he told a probation officer that he was bipolar and was not taking his medications. He also admitted to being involved with gangs and "brought up at least two incidents where he pulled a gun on another person." In addition, the probation officer stated that Alan had said he had been using and selling cocaine and using

alcohol. The court continued his secure detention pending the disposition hearing.

Later, in March 2015, the county attorney's office filed a supplemental petition with four new charges against Alan stemming from the altercation at his home in February. It alleged two additional counts of felonious conduct (making terroristic threats and use of a weapon to commit a felony), and two additional counts of misdemeanor conduct (third degree assault and a separate count of criminal mischief).

About a month later, the court held a disposition hearing on the original petition. (It had not yet held an adjudicated hearing on the supplemental petition.) The court placed Alan on probation and allowed him to move with his mother to Colfax County, Nebraska. At the adjudication hearing, Alan's mother had stated that she believed Alan needed medication for his mood changes. So the court ordered him to comply with three evaluations (psychological, psychiatric, and chemical dependency) and to have no contact with gangs or his mother's boyfriend.

In May 2015, after Alan had returned to Sarpy County, his new probation officer, Nicole Mercer, placed him in detention again for noncooperation. Later that month, the county attorney's office moved to commit Alan to OJS for placement at a YRTC. The motion alleged that Alan had (1) been previously committed to the YRTC and discharged in the summer of 2014; (2) claimed to be a gang member; (3) failed to cooperate with a predisposition interview and evaluation; (4) failed to attend school; (5) failed to complete probation or "Tracker"; and (6) expressed no desire to cooperate with further testing or evaluations. Generally, the motion alleged that Alan had exhausted all levels of probation supervision and that there was an immediate and urgent need to place him at the YRTC to protect him and the public. The motion also alleged that the YRTC would offer him treatment, schooling, and behavioral regimes, thus reducing his access to drugs. The motion, however, did not contain allegations about Alan's conduct in February.

On the same day that the county attorney filed a commitment motion, the court held a detention hearing. The evidence showed that Mercer had detained Alan in May after a home visit. Mercer had told Alan not to leave the house for a week without an adult, apparently because he had not cooperated with court-ordered evaluations. Alan told Mercer to get off his property and used "colorful" language. The record reflects that after the court adjudicated Alan on the supplemental petition, Mercer recommended the court continue Alan's detention and schedule a hearing on his commitment to the YRTC. The court continued Alan's detention and scheduled a combined review hearing, an arraignment on the supplemental petition, and a hearing on the commitment motion.

At the June 2015 hearing, Alan admitted to two counts of misdemeanor conduct on February 14, 2015 (third degree assault and criminal mischief). He admitted that he had threatened to shoot his mother's boyfriend with an unloaded gun and had kicked off his electronic monitor. The county attorney dismissed the counts alleging felonious conduct. The court adjudicated Alan under § 43-247(1) and continued the commitment hearing to the next week.

A week later, the court held a combined disposition hearing on the supplemental petition and a commitment hearing. The county attorney stated that because he had moved for a YRTC commitment before Alan admitted to the charges in the supplemental petition, he did not know whether he needed to amend the motion. The court recognized that the motion did not reflect the allegations in the supplemental petition but stated that it did not want to keep Alan in secure detention any longer than necessary if he was ready to proceed. Alan's attorney stated that he was ready.

Mercer testified that Alan initially walked away angry from the psychiatric evaluation, but he later completed it. He had not, however, complied with the recommendation that he take medication. He told the psychiatrist that he did not want treatment, and the psychiatrist did not think Alan would cooperate

with services. Furthermore, Alan had missed his appointment for a chemical dependency evaluation and had not been tested for drug use since returning to Sarpy County. Mercer said Alan's mother could not control him. Also, Mercer said that the previous year, she had supervised Alan at the YRTC and that he was part of her high-risk caseload. She did not believe there were any community-based services or other programming that probation could provide to help Alan.

But Alan's attorney successfully objected that the court could not question Mercer about services that Alan had received during his previous parole. After an off-the-record discussion with counsel, the court stated from the bench that it was denying the commitment motion "for lack of sufficient evidence presented at this hearing." In its June 2015 journal entry, the court "determined that the evidence was not sufficient at this time to meet the three prong test." But it continued the disposition on the supplemental petition to July.

In July 2015, the county attorney filed an amended motion to commit Alan to the YRTC. The allegations were the same. The court continued the disposition hearing to give the county attorney time to respond to Alan's argument that claim preclusion barred any new evidence that the State could have presented at the June commitment hearing. The court again continued the disposition hearing to August.

In August 2015, Alan filed a "motion to bar" any evidence of his conduct before the court's June order that found the evidence insufficient to support a commitment. The county attorney's office filed a second amended motion to commit. The only new allegations involved its claims that Alan had sabotaged a placement by threatening to run away or harm the staff there and that no other placement options were available. Later in August, at the second commitment hearing, the court received Mercer's affidavit with new information about Alan's conduct. She stated that Alan had sabotaged a placement in Arizona. The affidavit had three attachments: Mercer's summary of the State's supervision

efforts, a chemical dependency evaluation, and a psychiatric evaluation. Alan's attorney then called Mercer as a witness. After the hearing, the court found that the allegations of the second amended motion for commitment were true, placed him on intensive supervision probation, and committed him to OJS for placement at the YRTC.

## III. ASSIGNMENTS OF ERROR

Alan assigns, restated, that the court erred in ordering his commitment to the YRTC for the following reasons:

(1) The State failed to show by a preponderance of the evidence that all levels of probation supervision and community-based services had been exhausted;

(2) the doctrine of res judicata barred the State from presenting evidence at the August 2015 commitment hearing that it had presented, or could have presented, before the court entered its June order in which it declined to commit Alan to the YRTC;

(3) the "change of circumstances" principle did not apply to the court's August 2015 commitment order because in its June order, the court failed to make specific findings that would show what circumstances had changed; and

(4) the August 2015 commitment hearing deprived him of his due process right to confront and cross-examine his accusers.

## IV. STANDARD OF REVIEW

[1-4] An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.[1] Whether the doctrine of claim preclusion, or res judicata, bars relitigation of a claim presents a question of law.[2] Whether the procedures given an individual comport with constitutional requirements for procedural

---

[1] *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

[2] See *Hara v. Reichert*, 287 Neb. 577, 843 N.W.2d 812 (2014).

due process presents a question of law.[3] And an appellate court independently reviews questions of law decided by a lower court.[4]

## V. ANALYSIS

### 1. ALAN WAS NOT DENIED DUE PROCESS

Alan contends that the State denied him due process at the August 24, 2015, commitment hearing because it did not call as witnesses the persons who authored the reports that supported Mercer's affidavit. He argues that if the State had filed a motion to revoke his probation, he would have had a statutory right to confront and cross-examine witnesses against him. He contends that he was denied these rights at the commitment hearing and that the defect was not cured by his attorney's ability to call his probation officer as a witness. He argues that he could only ask Mercer open-ended questions on direct examination instead of cross-examining her.

As discussed later, we agree that the commitment procedures did not comply with our previous requirements under Neb. Rev. Stat. § 43-286 (Cum. Supp. 2012). This statute sets out a juvenile court's disposition options for juveniles who have been adjudicated under § 43-247(1), (2), or (4). Section 43-286 also governs revocation hearings for such juveniles. In 2013 and 2014, however, the Legislature substantially amended § 43-286. But we have not yet determined how our previous requirements interplay with the new statutory procedures for a YRTC placement when a court has already entered a disposition. As explained later, despite procedural flaws, the court's procedures did not deny Alan an opportunity to challenge the State's recommendations for the commitment. So he was not denied due process. But for future cases, we explain the effect of the statutory amendments.

---

[3] See *In re Interest of Landon H.*, 287 Neb. 105, 841 N.W.2d 369 (2013).

[4] See *Adair Asset Mgmt. v. Terry's Legacy*, 293 Neb. 32, 875 N.W.2d 421 (2016).

#### (a) Legislature Imposed New Requirements
#### for Commitments to OJS

Before 2013, § 43-286 did not constrain a juvenile court's discretion in a disposition order to commit a juvenile age 12 or older to OJS for placement at a YRTC. But a court could not place a juvenile under age 12 at a YRTC "unless he or she has violated the terms of probation or has committed an additional offense and the court finds that the interests of the juvenile and the welfare of the community demand his or her commitment."[5]

In 2013, the Legislature amended § 43-286 for all dispositions entered on or after July 1, 2013. After that date, a court could commit juveniles age 14 or older to OJS for placement at a YRTC as a condition of intensive supervision probation, but only if it made specific findings of fact. It had to find the existence of three conditions for a commitment: (1) all levels of probation supervision had been exhausted; (2) all options for community-based services have been exhausted; and (3) placement of such juvenile is a matter of immediate and urgent necessity for the protection of such juvenile or the person or property of another, or it appears that such juvenile is likely to flee the jurisdiction of the court.[6] Additionally, the commitment could not conflict with Neb. Rev. Stat. § 43-251.01 (Supp. 2013).[7] The 2013 bill amended § 43-251.01 to prohibit placing a juvenile under age 14 at a YRTC.[8]

A year later, the Legislature again amended § 43-286 to require the State to file a commitment motion and a juvenile court to conduct a hearing on that motion before the court could commit a juvenile to OJS for placement at a YRTC. Like the 2013 requirements, the 2014 requirements apply to

---

[5] 2011 Neb. Laws, L.B. 463, § 4.

[6] 2013 Neb. Laws, L.B. 561, § 23.

[7] See *id.*

[8] See *id.*, § 10.

all dispositions entered on or after July 1, 2013.[9] The amended § 43-286 requires the State's motion to set forth "specific factual allegations" that support the specified general allegations necessary for the commitment. It provides that at the hearing, the county attorney must prove the three conditions for a commitment by a preponderance of the evidence: (1) all levels of probation supervision have been exhausted; (2) all options for community-based services have been exhausted; and (3) the juvenile's placement at a YRTC is a "matter of immediate and urgent necessity for the protection of the juvenile or the person or property of another" or "it appears that such juvenile is likely to flee the jurisdiction of the court."[10]

But before these amendments, we had interpreted § 43-286 to require the State to comply with the procedural requirements for a new disposition when a juvenile court has already entered a disposition.

### (b) A Court Cannot Change a Disposition Under § 43-286(1)(a) Unless the State Complies With Procedures for a New Disposition

[5,6] We have previously considered the 2013 amendment of § 43-286, which required a court to find the three statutory conditions existed before committing a juvenile to OJS for placement at a YRTC. In *In re Interest of Nedhal A.*,[11] we explained that by imposing these conditions, the Legislature intended to make a juvenile's placement at a YRTC the placement of last resort. We held that before a juvenile court can order this placement, the "Office of Probation Administration must review and consider thoroughly what would be a reliable alternative to commitment at YRTC."[12] It must also provide

---

[9] See 2014 Neb. Laws, L.B. 464, § 20 (codified at § 43-286(1)(b)(ii) (Cum. Supp. 2014)).

[10] See § 43-286(1)(b)(ii)(B)(III).

[11] *In re Interest of Nedhal A.*, 289 Neb. 711, 856 N.W.2d 565 (2014).

[12] *Id.* at 716, 856 N.W.2d at 569.

a report to the court that supports one of the following conclusions: (1) there are "untried conditions of probation or community-based services [that] have a reasonable possibility for success" or (2) "all levels of probation and options for community-based services have been studied thoroughly and . . . none are feasible."[13] And the "review should consider the success or failure of prior supervisory conditions, even if the conditions were imposed by some other agency responsible for the child's care, such as [the Department of Health and Human Services]."[14] For example, the office could consider a juvenile's previous supervision under an adjudication in a neglect and dependency case.[15] In considering whether the State has shown that a juvenile should be placed at a YRTC, we specifically declined to require a juvenile court to repeat measures that were previously ineffective or unsuccessful.[16]

The juvenile in *In re Interest of Nedhal A.* had not previously been placed on probation for a law violation.[17] But we did not interpret the exhaustion requirement for probation supervision to mean that the juvenile must have previously been on probation and failed to comply with probation conditions. Instead, we required a report showing whether untried conditions of probation or community-based services had a reasonable possibility for success or were unfeasible.[18] But that case is distinguishable. We did not have to consider the proper procedures when a juvenile court has previously entered a disposition.

Notably, the 2013 and 2014 amendments did not change the dispositions authorized under § 43-286(1)(a). And both this

---

[13] *Id.*

[14] *Id.*

[15] See *id.*

[16] See *id.*

[17] See *In re Interest of Nedhal A., supra* note 11.

[18] *Id.*

court and the Nebraska Court of Appeals have held that once a court has entered a disposition, it is plain error to change that disposition when the State has not complied with the applicable statutory procedures.[19] The procedures for changing an existing disposition are now codified at § 43-286(5).[20] Section 43-286(5)(b) governs the procedure for revoking a juvenile's probation or court supervision and changing the disposition. Section 43-286(5)(a) allows a court to enter a new disposition when there are new allegations that "the juvenile is again a juvenile described in" § 43-247(1), (2), (3)(b), or (4). Complying with the procedures under § 43-286(5) is important because in a new adjudication proceeding or a revocation proceeding, the juvenile is entitled to procedural protections, including the right to confront and cross-examine adverse witnesses.[21]

[7] Of course, the Legislature would have been aware of our holdings regarding changes to an existing disposition before it enacted the 2013 and 2014 amendments to § 43-286. Yet, it did not create a freestanding commitment hearing. Instead, it specifically required a commitment to OJS to be part of a juvenile court's disposition. We must construe the provisions of § 43-286 so that they are consistent and harmonious.[22] So when a juvenile court has already entered a disposition under § 43-286(1)(a), the commitment to OJS under § 43-286(1)(b) must be consistent with the procedures for a new disposition under § 43-286(5). Summed up, under § 43-286(1), the State can file a motion to commit a juvenile

---

[19] See, *In re Interest of Markice M.*, 275 Neb. 908, 750 N.W.2d 345 (2008); *In re Interest of Torrey B.*, 6 Neb. App. 658, 577 N.W.2d 310 (1998).

[20] See L.B. 463, § 4.

[21] See Neb. Rev. Stat. § 43-279 (Reissue 2008) and § 43-286(5)(b)(ii).

[22] See, e.g., *Credit Mgmt. Servs. v. Jefferson*, 290 Neb. 664, 861 N.W.2d 432 (2015), quoting *Fisher v. PayFlex Systems USA*, 285 Neb. 808, 829 N.W.2d 703 (2013); *Hoppens v. Nebraska Dept. of Motor Vehicles*, 288 Neb. 857, 852 N.W.2d 331 (2014).

to OJS for placement at a YRTC at only three points in a delinquency proceeding: (1) before a court enters an original disposition, (2) before a court enters a new disposition following a new adjudication, or (3) before a court enters a new disposition following a motion to revoke probation or supervision.

### (c) State's Commitment Motion Did Not Comply With Procedures for a New Disposition

Here, in the court's disposition order following the first adjudication, the court placed Alan on probation and allowed him to live with his mother. Before the court entered that disposition, the county attorney's office had filed a supplemental petition with new allegations of conduct governed by § 43-247(1) and (2). But the State did not file a commitment motion before the court entered the first disposition that ordered probation and allowed Alan to live with his mother.

Later, after Alan's probation officer placed him in detention for noncooperation, the county attorney's office filed a commitment motion. The allegations focused solely on Alan's failure to comply with the terms of his probation. Yet, the county attorney did not move to revoke Alan's probation. Similarly, the allegations in the county attorney's two later commitment motions were related to Alan's noncooperation with his probation terms. But the State never filed a motion to revoke his probation.

These procedures did not comply with our case law regarding changes to a disposition. The commitment motion did not rest on new allegations under § 43-247. Because the motion rested on probation violations, the State should have filed a motion to revoke probation to support its requested change in the disposition. Although Nebraska appellate courts have previously reversed orders changing a disposition because of procedural flaws, we do not find plain error here.

### (d) Commitment Hearing Did Not Deprive
### Alan of Any Procedural Rights

[8] Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.[23] It is true that we found plain error in *In re Interest of Markice M*.[24] There, the State claimed that its motion for an evaluation hearing was a continuation of the disposition phase, after which the juvenile court could change the disposition. We rejected that argument. We stated that the motion contained no factual allegations that the juvenile had violated a term of his probation or a court order. The probation officer asked for a placement change because of concerns about the juvenile's safety, not his probation violations. We held that "[w]hen the State contends that a juvenile placed on probation has violated a term of probation or an order of the court, it is required to file a motion to revoke or change the disposition."[25] We found plain error because it failed to do so. Similarly, the Court of Appeals has held that a juvenile court committed plain error in committing a juvenile to OJS for placement at a YRTC when the State had not filed a pleading, motion, or notice that claimed the juvenile had violated the terms of his probation.[26]

[9] It is true that the State did not comply with our holding that it must move to revoke a juvenile's probation when it claims that a change in the disposition is required for probation violations. And we emphasize that prospectively, a revocation motion is concurrently required even if the State is seeking a juvenile's commitment to OJS for probation

---

[23] *In re Interest of Justine J. & Sylissa J.*, 288 Neb. 607, 849 N.W.2d 509 (2014).

[24] *In re Interest of Markice M., supra* note 19.

[25] *Id.* at 912-13, 750 N.W.2d at 349.

[26] *In re Interest of Torrey B., supra* note 19.

violations. But we have not previously held this. And the State's motion did put Alan on notice that it was seeking a commitment to OJS because of his probation violations. Alan did not contend that he did not have notice of its claim. And he has not shown that the State denied him any protections that he would have received had the State filed a revocation motion.

For probation revocations, § 43-286(5)(b)(ii) requires that juveniles have specified procedural protections, such as the rights to an attorney and to present evidence refuting the State's claims or showing mitigating circumstances. In particular here, a juvenile has the right to "confront persons who have given adverse information concerning the alleged violations [and] cross-examine such persons."[27] Alan was represented by counsel and not precluded from presenting evidence. He argues that he could not confront or cross-examine any persons "who authored the exhibit or who were identified as sources in the exhibit."[28] But the record fails to show that he attempted to subpoena the authors of the two evaluations attached to Mercer's affidavit.

As discussed above, in *In re Interest of Nedhal A.*,[29] we specifically held that the Office of Probation Administration must provide a report to the court showing that it has thoroughly considered whether untried probation conditions or community-based services have a reasonable probability for success or are not feasible. And the office must consider the success or failure of previous supervisory conditions, even if they were imposed by a different state agency.[30] Mercer prepared that summary, and Alan's attorney called her as a witness. But Alan argues that because the State did not call

---

[27] § 43-286(5)(b)(ii).

[28] Brief for appellant at 17.

[29] *In re Interest of Nedhal A., supra* note 11.

[30] See *id.*

Mercer, he could not cross-examine her. He argues that his attorney could ask Mercer only open-ended questions on direct examination. We reject that argument. Nothing prevented his attorney from asking Mercer leading questions.[31]

We conclude that Alan was not denied any procedural due process rights at the commitment hearing. We turn to his argument that the doctrine of res judicata precluded the court's consideration of the State's evidence at the August 24, 2015, commitment hearing.

## 2. State's Evidence That Alan Had Sabotaged a Placement Was Not Barred by the Doctrine of Claim Preclusion

On August 24, 2015, the court heard the county attorney's amended commitment motion and Alan's motion to bar any new evidence of his conduct before June 18. The court took judicial notice of the June 18 transcript. Relying on *In re Interest of V.B. and Z.B.*,[32] the court concluded it was not limited to considering new evidence that had arisen after the June 18 commitment hearing. The court reasoned that this case showed a juvenile court can consider new evidence with evidence previously presented in a juvenile case.

Alan argues that in the second amended commitment motion, the only new allegations were the claims that (1) he had sabotaged a placement at an Arizona residential treatment facility and (2) no other suitable placements were available. He contends that res judicata, i.e., the doctrine of claim preclusion,[33] barred any evidence that the State could have presented at the June 18 commitment hearing. He also contends that the court could not consider evidence showing a change of circumstances. He argues that because the court's first order failed to

---

[31] See Neb. Rev. Stat. § 27-611 (Reissue 2008).

[32] *In re Interest of V.B. and Z.B.*, 220 Neb. 369, 370 N.W.2d 119 (1985).

[33] See *Hara, supra* note 2.

set out findings of fact, the record fails to show what changed circumstances the court could have relied on in committing Alan. We disagree.

As stated, our review of this case is de novo on the record and we reach our conclusions independently of the juvenile court's findings.[34] Under this review, we conclude that the record did show changed circumstances that justified the commitment.

#### (a) Claim Preclusion Bars Relitigation of Claims That Were Available in Previous Litigation

We agree with Alan that the State could have presented most of the evidence it presented at the August 24, 2015, commitment hearing at the earlier June 18 hearing. We recognize that the State attempted to present evidence of its previous supervisory efforts through Mercer's testimony on June 18. Part of the procedural problem in this case stems from the court's failure to overrule Alan's incorrect objection to that evidence. But our decision in *In re Interest of Nedhal A.*[35] was issued in December 2014, 6 months before the court's first commitment hearing. And the Office of Probation Administration failed to present the required report showing the State's previous supervisory efforts and the office's thorough consideration of other probation or supervisory options. So at the August 24 hearing, the court was limited to considering evidence that showed changed circumstances.

[10,11] Claim preclusion bars the relitigation of a claim that has been directly addressed or necessarily included in a former adjudication if (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) the former judgment was on the merits,

---

[34] *In re Interest of Isabel P. et al., supra* note 1.

[35] *In re Interest of Nedhal A., supra* note 11.

and (4) the same parties or their privies were involved in both actions.[36] The doctrine bars relitigation not only of those matters actually litigated, but also of those matters that a party could have litigated in the prior action.[37] The doctrine rests on the necessity to terminate litigation and on the belief that a person should not be vexed twice for the same cause.[38]

### (b) Claim Preclusion Does Not Bar Consideration of Changed Circumstances

In *In re Interest of V.B. and Z.B.*, the case the court relied on, we discussed the effect of claim preclusion in considering successive motions to terminate parental rights.[39] After the first hearing, the juvenile court declined to terminate the parents' rights. After the State filed a supplemental petition to terminate, the court found the evidence sufficient to terminate both parents' rights. On appeal, the parents argued that claim preclusion barred reconsideration of evidence presented at the previous hearing which did not result in a termination order. We disagreed that "the only relevant time period in this case is from the date of the court's previous order."[40] We quoted the following statement from a case involving a child custody dispute:

> "A custodial order is conclusive as to all matters prior to its promulgation. But the doctrine of res judicata cannot settle a question of a child's welfare for all time to come; it cannot prevent a court at a subsequent time from determining what is best for the children at that time. The usual way of expressing this rule is to say

---

[36] *Hara, supra* note 2.

[37] See *id.*

[38] *Id.*

[39] *In re Interest of V.B. and Z.B., supra* note 32.

[40] *Id.* at 371, 370 N.W.2d at 121.

that 'circumstances have changed' when the order is no longer in the children's interest."[41]

We concluded that the same reasoning applied to successive parental termination proceedings:

In determining whether a change of circumstances exists so as to modify a juvenile court's previous order to a decision terminating parental rights, the court can use the time period prior to the previous order in conjunction with the time period after the previous order to determine whether there is a requisite change of circumstances since the original disposition order. . . . When a second termination proceeding is not itself barred, the proof is not limited by res judicata or collateral estoppel principles to facts or evidence which was not considered in, or which came into being after, the first proceeding. . . . The court would have been barred in the instant case from using evidence prior to the [first] order as the sole basis for terminating parental rights. However, the court correctly used evidence from the time period prior to the [first] order in conjunction with evidence from the time period after the [first] order in determining that there was the requisite change of circumstances or stagnation of conditions to terminate parental rights . . . .[42]

[12] In *In re Interest of V.B. and Z.B.*, we held that a juvenile court can compare the facts as they existed when it entered a previous order to new facts arising after that order to determine whether a change in circumstances warrants a different decision. We conclude that this general principle applies when the State files successive motions to change a juvenile's disposition under § 43-286.

---

[41] *Id.* at 372, 370 N.W.2d at 121 (citations omitted).

[42] *Id.* at 372, 370 N.W.2d at 122.

### 3. CHANGE IN CIRCUMSTANCES WAS
### SUFFICIENT TO SUPPORT THE
### COURT'S COMMITMENT ORDER

At the first commitment hearing on June 18, 2015, Alan had still not completed the court-ordered chemical dependency evaluation. The evaluation was not completed until June 29. This mental health provider stated that Alan had superficially cooperated in the evaluation and had provided information that conflicted with facts the provider knew about from other sources. She concluded that if the court placed him in his mother's home, he would present a risk to the community because of low supervision in the home and his history of aggression. She concluded that finding a placement in a group home with a treatment program would also be difficult because he was unlikely to comply with a structured environment. She cited his high-risk and aggressive behaviors, gang involvement, low response to psychiatric treatment, and refusal to take medications or engage in probation. She suggested a placement in "a boot camp program" or at the Arizona residential treatment facility, which was impliedly a highly structured program also.

But Mercer stated in her affidavit that after she obtained a placement for Alan at the Arizona facility, he sabotaged that placement during a telephone interview with the facility's representative. Alan "expressed that he did not want to go there and indicated that he would assault staff or other youths or run away." In Mercer's summary of supervision efforts, she reported that Alan told the representative that he would not cooperate with any programs and would never give up his gang ties.

We conclude that this evidence was sufficient to show a change in circumstances warranting Alan's commitment to OJS for placement at a YRTC. The evidence at the June 18, 2015, hearing showed that Alan had not cooperated with probation and psychiatric treatment while placed in his home. But the new evidence showed that Alan was also unlikely to

cooperate with any out-of-home treatment programs even after the State had made substantial efforts for his rehabilitation. And even if treatment at the Arizona facility did not constitute community-based services, Alan's conduct in response to that potential placement showed that he would not cooperate with a highly structured treatment placement that would provide more security than a typical group home treatment program. This evidence effectively tied the court's hands. It could only reasonably conclude that placing Alan in his home, a group home, or even a more structured treatment program would result in the endangerment of himself or others. It did not err in finding that all options for probation supervision and community-based services had been exhausted and that Alan's placement at a YRTC was a matter of urgent necessity for his own protection or the protection of others.

We conclude that the court did not err in placing Alan on intensive supervision probation and committing him to OJS for placement at the YRTC in Kearney, Nebraska.

AFFIRMED.