Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/16/2022 08:04 AM CST

In re Interest of Elijahking F., a child
under 18 years of age.
State of Nebraska, appellee, v.
Elijahking F., appellant.

___ N.W.2d ___

Filed December 16, 2022.    No. S-22-415.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.

2. **Statutes: Appeal and Error.** Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court.

3. **Criminal Law: Police Officers and Sheriffs: Judges: Proof: Intent.** To show a violation of Neb. Rev. Stat. § 28-906(1) (Reissue 2016), the State must prove that (1) the defendant intentionally obstructed, impaired, or hindered either a peace officer, a judge, or a police animal assisting a peace officer; (2) at the time the defendant did so, the peace officer or judge was acting under color of his or her official authority to enforce the penal law or preserve the peace; and (3) the defendant did so by using or threatening to use either violence, force, physical interference, or obstacle.

4. **Intent: Words and Phrases.** Intentionally means willfully or purposely, and not accidentally or involuntarily.

5. **Criminal Law: Evidence: Intent.** The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.

6. **Criminal Law: Statutes.** Penal statutes are considered in the context of the object sought to be accomplished, the evils and mischiefs sought to be remedied, and the purpose sought to be served.

7. ____: ____. Effect must be given, if possible, to all parts of a penal statute; no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided.

8. **Statutes.** In the absence of anything indicating otherwise, statutory language is to be given its plain and ordinary meaning.

9. **Criminal Law: Statutes.** Penal laws are those imposing punishment for an offense committed against the state and which the executive of the state has power to pardon.

10. **Criminal Law: Words and Phrases.** Preservation of the peace, as used in Neb. Rev. Stat. § 28-906(1) (Reissue 2016), means maintaining the tranquility enjoyed by members of a community where good order reigns.

11. **Criminal Law: Police Officers and Sheriffs: Protection Orders.** For purposes of Neb. Rev. Stat. § 28-906(1) (Reissue 2016), the serving of a protection order by a peace officer falls within "preservation of the peace."

12. **Criminal Law: Words and Phrases.** Threats can be expressed verbally, as well as through gestures and physical acts.

Appeal from the Separate Juvenile Court of Douglas County: Vernon Daniels, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Samuel A. Raybine for appellant.

Donald W. Kleine, Douglas County Attorney, and Christopher McMahon for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## I. INTRODUCTION

As deputies tried to serve a minor child's mother with a protection order and place her under arrest, the child interfered. The juvenile court adjudicated the child[1] for obstruction of a peace officer.[2] The child appeals. Because serving

---

[1] See Neb. Rev. Stat. § 43-247(1) (Reissue 2016) (adjudication of juvenile for misdemeanor offense).

[2] See Neb. Rev. Stat. § 28-906(1) (Reissue 2016).

a protection order falls within the preservation of the peace element of the misdemeanor offense and the State proved the other elements, we affirm the adjudication.

## II. BACKGROUND

Johnna Kripal and Wade Grim, deputies with the Douglas County sheriff's office, went to the residence of Elijahking F. to serve a protection order on his mother and arrest her on a misdemeanor warrant. The deputies encountered 17-year-old Elijahking and his mother in the front yard. The deputies were in uniform and displaying their badges of authority.

As Kripal approached, she informed Elijahking and his mother of the protection order and warrant for the mother's arrest. When Kripal tried to serve the mother with the protection order, Elijahking became agitated. He stepped in front of Kripal, flexed his arms, and started yelling at the deputies. Ultimately, the deputies placed handcuffs on Elijahking and removed him to the back of their cruiser. Kripal was then able to complete the mission of serving Elijahking's mother with the papers. The entire encounter lasted 5 to 10 minutes.

The State filed a petition in the separate juvenile court of Douglas County, alleging that Elijahking was a juvenile within § 43-247(1) for obstructing a peace officer. During an adjudication hearing, the juvenile court heard the testimonies of Kripal and Elijahking.

Kripal testified that at first, Elijahking was yelling repeatedly, "'Are you serious?'" Then, he said to Kripal: "'You're little. You're going to need that gun.'" When asked if those words "raise[d Kripal's] level of awareness of the situation," she answered, "Yes, it did." As Kripal was going to step around Elijahking to arrest his mother, Elijahking "kind of stepped in front of [Kripal]." Kripal clarified that Elijahking "insert[ed] his way in between" Kripal and Elijahking's mother, who had started moving back. Kripal testified that there was enough room for her to move around Elijahking, which is what she was trying to do. Grim then "took [Elijahking] down." Kripal

testified that Elijahking's actions hindered or slowed her goal of serving Elijahking's mother.

Elijahking testified that he and his mother were "trying to just go inside" and that the deputies "kind of just forced us to stop." The deputies stated that they needed to serve a protection order and then Kripal pulled out her gloves. Elijahking testified that when he asked why Kripal needed gloves to serve a protection order, she informed him that his mother had a warrant and that they were going to take her to jail. Elijahking then became very upset and used profanity. According to Elijahking, his mother had been backing steadily up the stairs to the porch. He testified that the deputies were circling him on the stairs "to the point where, like, the back of my legs were up against the stairs." He explained that he could not move anywhere if he wanted to get out of their way. Elijahking testified that once Kripal tried to get past him, Grim "attacked" Elijahking and Elijahking showed some resistance as Grim tried to take him down. According to Elijahking, he was merely showing frustration and was not trying to interfere with the deputies.

The juvenile court found that the State proved beyond a reasonable doubt that Elijahking was a juvenile described in § 43-247(1). It further found that Kripal's testimony was "more credible, probative, reliable and entitled to weight."

Elijahking timely appealed the adjudication order, and we moved the appeal to our docket.[3]

### III. ASSIGNMENT OF ERROR

Elijahking alleges, consolidated and restated, that the State failed to prove beyond a reasonable doubt that he committed the crime of obstructing a peace officer.

### IV. STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the

---

[3] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2022).

juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.[4]

[2] Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court.[5]

## V. ANALYSIS

[3] The juvenile court determined that the State proved beyond a reasonable doubt that Elijahking obstructed a peace officer. To show a violation of § 28-906(1), the State must prove that (1) the defendant intentionally obstructed, impaired, or hindered either a peace officer, a judge, or a police animal assisting a peace officer; (2) at the time the defendant did so, the peace officer or judge was acting under color of his or her official authority to enforce the penal law or preserve the peace; and (3) the defendant did so by using or threatening to use either violence, force, physical interference, or obstacle.[6] Elijahking challenges the sufficiency of the evidence as to each of the three elements. We discuss each element in turn.

### 1. Intent

[4] Elijahking contends that the State failed to prove his actions were intentional. This argument is directed to the element requiring that an individual "intentionally obstruct[ed], impair[ed], or hinder[ed]" a peace officer.[7] Intentionally means willfully or purposely, and not accidentally or involuntarily.[8]

[5] Elijahking's argument attacks the lack of insight provided by Kripal's testimony into Elijahking's mindset or

---

[4] *In re Interest of Gunner B.*, 312 Neb. 697, 980 N.W.2d 863 (2022).

[5] *In re Interest of Jordon B.*, 312 Neb. 827, 981 N.W.2d 242 (2022).

[6] *State v. Ferrin*, 305 Neb. 762, 942 N.W.2d 404 (2020).

[7] § 28-906(1).

[8] *State v. Schott*, 222 Neb. 456, 384 N.W.2d 620 (1986).

intentions. But the intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident.[9] Kripal's testimony established that as she tried to serve papers on Elijahking's mother, Elijahking became agitated, stepped in front of Kripal, flexed his arms, and yelled at the deputies. Kripal further testified that Elijahking told her she was going to need her gun. One can reasonably infer from Elijahking's behavior that he intended to obstruct, impair, or hinder the deputies. We conclude the State proved beyond a reasonable doubt that Elijahking intentionally obstructed, impaired, or hindered the deputies.

## 2. COLOR OF OFFICIAL AUTHORITY
### ALTERNATIVES

To satisfy the second element of obstructing a peace officer, the State must prove that at the time of the defendant's obstruction, impairment, or hindrance, the peace officer was acting under color of his or her official authority to enforce the penal law or preserve the peace.[10] Elijahking's arguments regarding the peace officer's alternative purposes rely upon statutory interpretation. After setting forth principles of statutory interpretation, we discuss whether the deputies were acting under color of their official authority and whether they were enforcing the penal law or preserving the peace.

### (a) Statutory Interpretation

[6-8] When considering the text of a criminal statute, we follow well-known principles of statutory interpretation and construction. Penal statutes are considered in the context of the object sought to be accomplished, the evils and mischiefs sought to be remedied, and the purpose sought to be served.[11]

---

[9] *State v. Bryant*, 311 Neb. 206, 971 N.W.2d 146 (2022).

[10] See *State v. Ferrin, supra* note 6.

[11] *Id.*

Effect must be given, if possible, to all parts of a penal statute; no sentence, clause, or word should be rejected as meaningless or superfluous if it can be avoided.[12] In the absence of anything indicating otherwise, statutory language is to be given its plain and ordinary meaning.[13]

### (b) Color of Official Authority

We quickly dispose of the color of official authority component. The deputies were in uniform and displaying their badges of authority when Kripal informed Elijahking's mother of the protection order and arrest warrant. There is no dispute that they were acting under color of their official authority at the time of their encounter with Elijahking. The next component is whether the deputies were either enforcing the penal law or preserving the peace.

### (c) Enforcement of Penal Law

The deputies went to Elijahking's residence to serve a protection order on his mother and to arrest her on a misdemeanor warrant. Elijahking does not dispute that executing an arrest warrant qualifies as the enforcement of the penal law, but he argues that serving a protection order does not. Because our review is de novo, we address that question.

[9] Penal laws are those imposing punishment for an offense committed against the state and which the executive of the state has power to pardon.[14] There can be no doubt that a peace officer's arrest or investigation of a person for violating a protection order, which is a crime,[15] would qualify as enforcement of the penal law. That was the situation in *State*

---

[12] *Id.*

[13] *Id.*

[14] See, *Huntington v. Attrill*, 146 U.S. 657, 13 S. Ct. 224, 36 L. Ed. 1123 (1892); *Arthur v. Trindel*, 168 Neb. 429, 96 N.W.2d 208 (1959).

[15] See Neb. Rev. Stat. §§ 28-311.09(4), 28-311.11(4), and 42-924(4) (Cum. Supp. 2022).

*v. Cervantes*.[16] There, when officers went to the defendant's home to return property, they were greeted by her husband, against whom the officers knew the defendant had a protection order. We stated, "The continued presence of law enforcement at [the defendant's] home was in service of the enforcement and investigation of a penal law, § 42-924(4)."[17] But here, there was no evidence regarding a violation of the protection order.

The question is whether merely serving a protection order qualifies as enforcement of the penal law. At this juncture, we note that the record does not reveal the type of protection order or who obtained it. The penal law explicitly provides for a peace officer's involvement in serving harassment[18] and sexual assault[19] protection orders. Thus, if the deputies here were trying to serve a harassment or sexual assault protection order, doing so would fall within the scope of enforcing the penal law. Similarly, Neb. Rev. Stat. § 42-926 (Cum. Supp. 2022) plainly provides for service of a domestic abuse protection order by law enforcement, and as mentioned, violation of such a protection order is a crime.[20]

To the extent there is any doubt regarding whether serving a protection order falls within the ambit of § 28-906(1), it fits within the alternative law enforcement function of preservation of the peace. We explain why next.

### (d) Preservation of Peace

[10] Even if a peace officer is not involved in enforcement of the penal law, an individual may not intentionally obstruct the officer's "preservation of the peace."[21] We have stated that

---

[16] *State v. Cervantes*, 306 Neb. 740, 947 N.W.2d 323 (2020).

[17] *Id.* at 747, 947 N.W.2d at 329.

[18] § 28-311.09(9)(a).

[19] § 28-311.11(9)(a).

[20] See § 42-924(4).

[21] § 28-906(1).

"'[p]reservation of the peace,'" as used in § 28-906(1), means maintaining the tranquility enjoyed by members of a community where good order reigns.[22] A different court has described an officer's efforts to preserve the peace as including ordinary police functions that do not directly involve placing a person under arrest.[23]

Preservation of the peace has an ancient pedigree. The power to require security to keep the peace is considered part of the common law of England and of this country.[24] And in 1866, Nebraska adopted the common law of England.[25] Looking back to the territorial laws of Nebraska, judges of the district courts and justices of the peace were authorized to enforce all laws "for the prevention and punishment of offenses, or for the preservation and observance of the peace."[26] Judges, justices of the peace, and sheriffs were "bound to preserve the public peace."[27] Similar provisions to prevent crimes and offenses remained in our statutes[28] until repealed in 1986.[29]

Before adoption of our current Nebraska Criminal Code in 1977,[30] two statutes were somewhat comparable to the statute now before us. One, categorized under "Obstructing and Perverting Justice," prohibited a person from "corruptly, or by threats of force, . . . obstruct[ing] or imped[ing]

---

[22] See *In re Interest of Richter*, 226 Neb. 874, 876, 415 N.W.2d 476, 477 (1987).

[23] See *People v. Little*, 434 Mich. 752, 456 N.W.2d 237 (1990).

[24] 11 C.J.S. *Breach of the Peace* § 18 (2019).

[25] See Rev. Stat. ch. 7, § 1, p. 31 (1866), now codified at Neb. Rev. Stat. § 49-101 (Reissue 2021).

[26] See Criminal Code, ch. 18, § 214, p. 644 (1866).

[27] Criminal Code, ch. 11, § 127, p. 620 (1866).

[28] See, e.g., Rev. Stat. §§ 8921 to 8936 (1913); Comp. Stat. §§ 9945 to 9960 (1922); Comp. Stat. §§ 29-301 to 29-316 (1929); Neb. Rev. Stat. §§ 29-301 to 29-312 (Reissue 1985).

[29] See 1986 Neb. Laws, L.B. 529, § 58.

[30] See 1977 Neb. Laws, L.B. 38.

the due administration of justice."[31] The other, categorized under "Disruption of Public Peace," proscribed "purposely obstruct[ing], or impair[ing] the administration of law or other governmental function by force, violence, physical interference or obstruction, or any other unlawful act."[32]

In light of this historical context, we turn to the plain language of the current statute. It prohibits a person from, among other things, using or threatening to use violence or obstacle to intentionally hinder "the enforcement of the penal law or the preservation of the peace by a peace officer."[33]

[11] By enacting protection order statutes, the Legislature intended to protect applicants from abuse. It wished to "protect victims from being willfully harassed, intentionally terrified, threatened, or intimidated."[34] It also endeavored to "aid in the prevention and elimination of domestic violence."[35] The very goal of a protection order is to preserve the peace. We conclude that for purposes of § 28-906(1), the serving of a protection order by a peace officer falls within "preservation of the peace." Thus, the State proved beyond a reasonable doubt that the deputies were engaged in "the enforcement of the penal law or the preservation of the peace."[36]

### 3. OBSTRUCTION

Finally, Elijahking contends that the State failed to show the deputies were obstructed by his statements or actions. He highlights that the entire encounter occurred over a short period of time and that Kripal testified she was able to serve Elijahking's mother with the paperwork. But that does not

---

[31] Neb. Rev. Stat. § 28-737 (Reissue 1975).

[32] Neb. Rev. Stat. § 28-824 (Reissue 1975).

[33] § 28-906(1).

[34] Neb. Rev. Stat. § 28-311.02(1) (Reissue 2016). See, also, §§ 28-311.09(1) and 28-311.11(1).

[35] Neb. Rev. Stat. § 42-905(4) (Reissue 2016). See, also, § 42-924(1)(a).

[36] § 28-906(1).

mean that Elijahking did not obstruct the deputies. To satisfy the third element of § 28-906(1), the State needed only to show that Elijahking "us[ed] or threaten[ed] to use violence, force, physical interference, or obstacle" to intentionally obstruct, impair, or hinder the deputies. The State did so.

We have defined the words "interference" and "obstacle" for purposes of § 28-906. "[T]he word 'interference' means '[t]he action or fact of interfering or intermeddling (with a person, etc., or in some action).' Similarly, 'obstacle' means '[s]omething that stands in the way or that obstructs progress (literal and figurative); a hindrance, impediment, or obstruction.'"[37]

Giving § 28-906(1) its plain and ordinary meaning, we have determined that a disruptive youth's act of running away from police officers constituted a physical obstacle that obstructed, impaired, or hindered the officers' efforts to preserve the peace.[38] We have also determined that repeatedly refusing to comply with police orders to exit a vehicle during a traffic stop that was part of an active police investigation was sufficient to show that a defendant used physical interference or obstacle to intentionally obstruct, impair, or hinder the officers in their investigation.[39]

[12] The evidence here established that Elijahking interfered with the deputies' mission. We are mindful that threats can be expressed verbally, as well as through gestures and physical acts.[40] Kripal testified that when she tried to serve the protection order, Elijahking stepped in front of her. Similarly, when Kripal attempted to step around Elijahking to arrest his mother, Elijahking stepped in front of Kripal. This presented an obstacle and interfered with Kripal's ability to serve the mother with paperwork and execute an arrest. Kripal further

---

[37] *State v. Ferrin, supra* note 6, 305 Neb. at 777, 942 N.W.2d at 415 (emphasis omitted).

[38] See *In re Interest of Richter, supra* note 22.

[39] See *State v. Ferrin, supra* note 6.

[40] See *id.*

testified that Elijahking was agitated, flexed his arms, yelled at the deputies, and told Kripal she would "'need that gun.'" Such behavior could reasonably be interpreted as threatening to use violence. Ultimately, the deputies placed handcuffs on Elijahking and removed him to their cruiser, which was a diversion from their mission. When asked if Elijahking's actions "hinder[ed] or slow[ed Kripal's] original goal of serving" the mother, Kripal answered, "Yes." We conclude the State proved that Elijahking obstructed the deputies.

## VI. CONCLUSION

We conclude that the State adduced sufficient evidence to prove beyond a reasonable doubt that Elijahking intentionally obstructed the deputies by using or threatening to use violence, physical interference, or obstacle while the deputies acted under color of their official authority to enforce the penal law or preserve the peace. Accordingly, we affirm the juvenile court's order adjudicating him to be a child within the meaning of § 43-247(1).

Affirmed.