IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF TYMEER W.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF TYMEER W., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

LASHANNON H., APPELLANT.

Filed March 14, 2023.    No. A-22-717.

Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Ronald C. Betita for appellant.

Rachel Lowe, Deputy Douglas County Attorney, for appellee.

PIRTLE, Chief Judge, and MOORE and WELCH, Judges.

WELCH, Judge.

## INTRODUCTION

LaShannon H. appeals from the decision of the Separate Juvenile Court of Douglas County adjudicating his child, Tymeer W., as being within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). LaShannon asserts that the juvenile court erred in finding that there was sufficient evidence to prove that Tymeer was at risk for harm and came within the meaning of the statute. For the reasons stated herein, we affirm.

## STATEMENT OF FACTS

LaShannon H. and Desiree W. are the biological parents of Tymeer, born in March 2020. Desiree has not separately appealed from the order of adjudication and is therefore not a part of this appeal.

- 1 -

In January 2022, the Department of Health and Human Services (DHHS) received an intake alleging that Desiree had physically abused one of Tymeer's half-sisters. During its investigation, DHHS discovered multiple reports of domestic abuse occurring between Desiree and LaShannon, prior intakes reporting physical neglect or abuse of Tymeer's sisters by LaShannon, and concerns regarding possible drug use in the home. A criminal history search of LaShannon indicated prior charges related to domestic violence, terroristic threats, and drugs. Following the investigation, the initial assessment worker determined that Tymeer was at risk for harm and filed an affidavit for removal of Tymeer. Tymeer was subsequently placed in foster care with LaShannon's ex-girlfriend, Belinda J., who also has a child with LaShannon. LaShannon was not confirmed to be Tymeer's biological father until April 2022.

Following Tymeer's removal and the determination that LaShannon was Tymeer's father, the State filed a second supplemental petition alleging that Tymeer came within the meaning of § 43-247(3)(a) because he lacked proper parental care by reason of the faults or habits of LaShannon in that LaShannon engaged in domestic violence in Tymeer's presence; used alcohol and/or controlled substances; subjected Tymeer's sibling to inappropriate physical contact or discipline; failed to provide Tymeer with safe, stable, or appropriate housing; failed to provide proper parental care, support, supervision or safety to Tymeer; and that, due to the aforementioned allegations, Tymeer was at risk for harm.

The adjudication hearing was held in August 2022. Testimony was adduced from Katherine Nastase, a DHHS Initial Assessment Worker; Kenzie Lathrum, a DHHS Child and Family Services Specialist; and Shondra B. and Sharayah B., Tymeer's half-sisters.

Nastase testified that she received the January 2022 initial intake regarding Desiree's physical abuse of one of Tymeer's half-sisters. According to Nastase, although the initial intake did not involve LaShannon, she investigated LaShannon who, at that time, had not been established as Tymeer's father. Nastase's investigation included interviews with Sharayah, Shondra, Desiree, LaShannon, and other family members, and an unannounced home visit and walkthrough. During the walkthrough, Nastase observed a white powdery substance on a bedroom dresser. Thereafter, she exited the home to contact her supervisor and LaShannon, but upon her return to the home with law enforcement, the white powdery substance had been removed. When asked to identify the substance, Desiree informed Nastase that it was MiraLAX and cigarette ashes. During her investigation, Nastase became concerned with Tymeer's safety due to LaShannon's prior intakes and criminal history, which included allegations of domestic violence, abuse, neglect, and substance use. Nastase determined that Tymeer was at risk of harm and filed an affidavit for removal.

In April 2022, Lathrum took over the case. Lathrum testified that her investigation included reviewing LaShannon's prior intakes and criminal history and meeting with LaShannon, who was residing with his daughter. LaShannon informed her that he had medical concerns, that he was unable to care for Tymeer at that time and was unsure when he would be in a position to do so, and that he preferred that Tymeer stay with Belinda. Following her investigation, Lathrum concluded that Tymeer would be at risk of harm if placed with LaShannon.

Tymeer's sisters both testified that during the approximately three years that they resided with Desiree and LaShannon, they witnessed frequent arguments between Desiree and LaShannon which became physical and which occurred in Tymeer's presence. They indicated that they saw

LaShannon hit and push Desiree, as well as saw him throw household items. Sharayah testified that on one occasion, she witnessed LaShannon hit Desiree in the head while she was driving all three children to their grandmother's house because LaShannon did not want Tymeer around their grandmother. Sharayah testified to another occasion where LaShannon wrapped a charging cord around Sharayah's neck causing her to have difficulty breathing and causing her to believe she was going to die. Shondra and Sharayah testified that LaShannon made numerous threats towards Desiree, their aunt, and their grandmother, including a threat to shoot up their grandmother's house with them inside and a threat to kill their aunt's baby.

Both girls also testified to drug use occurring in the home in front of them and Tymeer. Shondra specifically testified that she witnessed Desiree and LaShannon rolling up and smoking "green stuff" which LaShannon referred to as "weed." Additionally, both girls testified to seeing a white powdery substance on a bedroom dresser but neither saw LaShannon use it. However, Sharayah testified that she observed the white powdery substance on LaShannon's nose when he exited the bedroom.

Sharayah further testified to an occasion where Tymeer had found and picked up a gun from under the couch while searching for his toys. After this occasion, she testified that she witnessed the gun on or under the couch accessible to all the children.

Following the close of the evidence, the district court adjudicated Tymeer as being a child within the meaning of § 43-247(3)(a). Specifically, the district court found that Shondra and Sharayah "were credible witnesses," that they "were able to provide detailed examples of violence they witnessed while living with [Desiree] and [LaShannon]," and "that their respective testimonies corroborated each other." The court further found that Shondra and Sharayah

> both testified to the arguments between [Desiree] and [LaShannon] turning physical at times. Shondra testified that [LaShannon] hit her mother on her head causing it to go back into the wall behind her. Sharayah testified that [LaShannon] would push her mother or hit her on the head. Sharayah provided several detailed examples of domestic violence. One example involved [LaShannon] assaulting her mother while her mother was driving in 2020 because [LaShannon] did not want [Tymeer] to go to their grandmother's house. Another example involved [LaShannon] becoming upset over the loss of twenty dollars and subsequently shaking her mother and slapping her on the cheek. Shondra also testified that [LaShannon] would throw household items during arguments, such as food. Sharayah testified similarly that said items [LaShannon] would throw included plates, cups, food, bleach, and soap;
>
> 6. [Shondra and Sharayah] both testified that [Desiree] and [LaShannon] would frequently argue. Both girls testified that their arguments were cyclical. . . . both testified that [LaShannon] would frequently making violent threats in their presence. Shondra testified [LaShannon] would threaten [Desiree] and her grandmother, and on one occasion [LaShannon] said he would blow up her grandmother's house. Sharayah testified that [LaShannon] would threaten to shoot up her house, her aunt's house, or her grandmother's house. Sharayah testified she saw what looked like a firearm both under the couch in the living room and in the bedroom that [LaShannon] shared with her mother.
>
> . . . .

9. [Shondra and Sharayah] both testified that when arguments occurred they would feel scared. Shondra testified that she did not feel safe at her mother, [Desiree's] home when [LaShannon] was present. Sharayah testified that she felt [LaShannon] would follow through on his threats of violence and she did not want to die;

10. . . . [Sharayah] also gave a detailed example of being physically abused by [LaShannon] on Christmas Eve of 2021. While [Desiree] was styling her hair, [LaShannon] approached Sharayah with a charging cord, put the charging cord around her neck, and pulled hard. Sharayah testified that it was hard to breathe and that she thought she was going to die;

11. [Shondra and Sharayah] both testified to observing [LaShannon] and [Desiree] use drugs in the family home. Shondra testified she observed [LaShannon] using "green stuff" that he referred to as weed. Shondra testified [LaShannon] would smoke everyday and that [LaShannon's] weed was on a tray in the living room. After [LaShannon] smoked, Shondra state[d] that he would "act high." Shondra also saw white powder on top of her mother's dresser on a daily basis. Sharayah also testified to observing white powder on her mother's dresser. Sharayah testified that she saw [LaShannon] with "white stuff in a baggie" every other day. [LaShannon] would go into his bedroom with the "white stuff" and when he would exit, he would have white powder on his nose. When [LaShannon] would emerge, Sharayah testified that he would act hyper, would become angry over little things, and would yell. Sharayah also testified that she observed [LaShannon] exchange baggies of the "white stuff" for money from people who would come to their apartment[.]

LaShannon has timely appealed from the order adjudicating Tymeer pursuant to § 43-247(3)(a).

ASSIGNMENT OF ERROR

LaShannon's sole assignment of error is that the juvenile court erred in finding that there was sufficient evidence to prove that Tymeer was at risk for harm and that he came within the meaning of § 43-247(3)(a).

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Elijahking F.*, 313 Neb. 60, 982 N.W.2d 516 (2022).

ANALYSIS

LaShannon assigns that the juvenile court erred in finding that the evidence was sufficient to adjudicate Tymeer pursuant to § 43-247(3)(a). More specifically, he argues that the State failed to prove that he had engaged in domestic violence, used controlled substances or alcohol, had inappropriate physical contact or discipline, failed to provide appropriate housing, and failed to provide proper parental care for Tymeer's health, morals, or well-being.

To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Draygon W. et al.*, 31 Neb. App. 400, 980 N.W.2d 648 (2022). While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id.* The State must prove such allegations by a preponderance of the evidence. *Id.*

Section § 43-247, which sets out the grounds by which a juvenile court can take jurisdiction over a juvenile, states in relevant part that:

The juvenile court in each county shall have jurisdiction of:

. . . .

(3) Any juvenile (a) . . . who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile; whose parent, guardian, or custodian is unable to provide or neglects or refuses to provide special care made necessary by the mental condition of the juvenile; who is in a situation or engages in an occupation, including prostitution, dangerous to life or limb or injurious to the health or morals of such juvenile; or who, beginning July 1, 2017, has committed an act or engaged in behavior described in subdivision (1), (2), (3)(b), or (4) of this section and who was under eleven years of age at the time of such act or behavior. . .

In Nebraska, the rights of the parent and the child are protected by the separate adjudication and dispositional phases of the dependency proceeding. *In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017). A petition brought under § 43-247(3)(a) is brought on behalf of the child, not to punish the parents. The purpose of the adjudication phase of the proceeding is to protect the interests of the child; the purpose of the dispositional phase is to determine placement and the rights of the parties in the action. *Id.* It is not improper for the court to sustain jurisdiction at the adjudication phase if the State establishes a lack of proper parental care in the child's present living situation. *Id.*

Here, the grounds alleged in the second supplemental petition, which the juvenile court found were proved by sufficient evidence, included that Tymeer lacked proper parental care by reason of the faults or habits of LaShannon as LaShannon engaged in domestic violence in Tymeer's presence; used alcohol and/or controlled substances; subjected Tymeer's sibling to inappropriate physical contact or discipline; failed to provide Tymeer with safe, stable, or appropriate housing; failed to provide proper parental care, support, supervision or safety to Tymeer; and that, as a result, Tymeer was at risk for harm. LaShannon does not argue these grounds are insufficient to support a finding of jurisdiction under § 43-247(3)(a). Instead, he simply argues the evidence was insufficient to establish the grounds pled.

Based on our de novo review of the record, we find that the State provided sufficient evidence to support the grounds pled for the juvenile court to adjudicate Tymeer. Here, not only did the State prove the risk of future harm due to LaShannon's drug use and domestic violence, but also that one child actually suffered physical harm when she was choked by LaShannon. See

*In re Interest of Miah T. & DeKandyce H.*, 23 Neb. App. 592, 875 N.W.2d 1 (2016) (while specific circumstances leading to child's adjudication involved only mother and not father, there was evidence presented during juvenile court proceedings which indicated that father also may not be able to provide child a safe and stable home free from domestic violence); *In re Interest of T.M.B. et al.*, 241 Neb. 828, 491 N.W.2d 58 (1992) (juvenile court found that mother and stepfather did not provide proper parental support because children were regularly beaten with a belt and mother and stepfather had violent relationship in which they physically fought and threatened to kill each other). See also *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018) (evidence that child was environmentally exposed to methamphetamine suggests that either or both parents used drug around child sufficient to prove nexus between use of substance and risk of harm).

In reaching its decision, the juvenile court found that Shondra and Sharayah's testimony was credible. Both girls testified that they did not feel safe in the home because LaShannon and Desiree argued often and that some of their arguments turned physical while in the children's presence including Tymeer. They testified that they observed LaShannon hitting and pushing Desiree and throwing household items. One specific incident involved LaShannon hitting Desiree while she was driving with the children in the car. They also testified to hearing LaShannon make threats towards Desiree, their aunt, and their grandmother which threats specifically included threatening to shoot up their grandmother's house. Sharayah testified that on one occasion, LaShannon put a cord around her neck and pulled on it causing her to have difficulty breathing and to fear she was going to die. Shondra and Sharayah further testified that LaShannon used illegal substances with Desiree in the presence of the children and that the substances were accessible.

Both Nastase and Lathrum opined that Tymeer would be at risk of harm if placed in LaShannon's care due, at least in part, to LaShannon's history of domestic violence and drug use. Lathrum testified that domestic violence in the home presents a safety risk because it places the children in harm's way. Lathrum further testified that LaShannon could not provide safe and stable housing because he was residing with his daughter and he admitted to her that he was currently unable to care for Tymeer, was unclear about when he would be able to provide care to Tymeer, and that he preferred that Tymeer stay in the current foster home with Belinda.

Although LaShannon disputes that the evidence adduced at the adjudication hearing established that he had engaged in domestic violence, used controlled substances or alcohol, had inappropriate physical contact or discipline, failed to provide appropriate housing, and failed to provide proper parental care for the health, morals, or well-being of Tymeer, we find that the testimony by Shondra, Sharayah, Nastase, and Lathrum supported the allegations in the petition and the juvenile court explicitly found the testimony to be credible. Nor did LaShannon deny the allegations. Based upon our de novo review of the evidence, we find that the State presented sufficient evidence to prove the allegations in the petition by a preponderance of the evidence.

## CONCLUSION

Because we find that the court did not err in finding that the State proved the allegations in the petition by a preponderance of the evidence, we affirm the juvenile court's adjudication of Tymeer pursuant to § 43-247.

AFFIRMED.