IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF TRINITY F.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF TRINITY F., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CHARLES F., APPELLANT.


Filed March 14, 2023.    No. A-22-624.


Appeal from the Separate Juvenile Court of Douglas County: CHAD M. BROWN, Judge. Affirmed.

Beau Finley, of Law Offices of Beau Finley, P.C., L.L.O., for appellant.

Daniel Gubler, Deputy Douglas County Attorney, for appellee.


PIRTLE, Chief Judge, and MOORE and WELCH, Judges.

MOORE, Judge.

### INTRODUCTION

Charles F. appeals from the order of the separate juvenile court of Douglas County, terminating his parental rights to his minor child. The court found that termination of Charles' parental rights was proper under Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Reissue 2016) and that termination of his parental rights was in his child's best interests. Following our de novo review of the record, we affirm.

### STATEMENT OF FACTS

Shuree S. is the mother and Charles is the father of Trinity F., born in September 2012. Shuree is also the mother of another minor child, who has a father other than Charles. The Nebraska Department of Health and Human Services (the Department) received an intake in

- 1 -

February 2019, concerning the physical neglect of the children by Shuree. This intake was determined to be unfounded. The Department received another intake on April 4, concerning the children's physical neglect by Shuree and involving domestic violence between Shuree and Charles. At that point, the children were residing with Shuree, Charles was living separately, and the other father was incarcerated. The second intake led to the removal of the children from Shuree's residence and their placement in the Department's custody on April 5. The children have remained in out-of-home placements since that time. Shuree's parental rights to Trinity were terminated during the course of these proceedings. The status of proceedings with respect to Shuree, the other father, and the other minor child are not clear from the record. Shuree and the other father are not involved in the present appeal, and we reference them and the other minor child only as necessary.

On April 5, 2019, the State filed a petition in the juvenile court, alleging that Trinity was a minor child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) and lacked proper parental care due to the fault or habits of Charles. Specifically, the State alleged that Trinity was at risk for harm because Charles engaged in domestic violence in her presence; had failed to provide proper parental care, support, and/or supervision for her; and had failed to provide her with safe, stable housing. The State also filed an ex parte motion for immediate custody of Trinity, with placement to exclude Charles' home, which the juvenile court granted.

On June 3, 2019, the juvenile court entered an order adjudicating Trinity as a child within the meaning of § 43-247(3)(a). Based on Charles' admission, the court found as true the allegation that Trinity was at risk for harm because Charles had failed to provide her with proper parental care, support, and/or supervision. The other counts of the petition were dismissed. The court ordered Charles to: (1) have agency-supervised visitation with Trinity, (2) complete a batterers' intervention class, (3) maintain safe and stable housing, (4) maintain a stable and legal source of income, (5) complete a parenting class, (6) complete a full-scale psychological evaluation, and (7) prepare a budget. Similar orders were entered following subsequent review and permanency planning hearings, with the added requirements that Charles participate in family support services, communicate with all case professionals, and sign all releases of information. He was also ordered to participate in relinquishment counseling, complete a chemical dependency evaluation, and submit to random urinalysis testing.

On February 5, 2021, the State filed a motion seeking termination of Charles' parental rights. Following a hearing on May 20, the juvenile court entered an order granting the State's motion to dismiss the termination motion; Charles was making progress on his case plan requirements at that point.

On January 27, 2022, the State filed another motion seeking termination of Charles' parental rights. The State alleged termination was proper pursuant to § 43-292 (2), (4), (6), and (7) and that termination of Charles' parental rights was in Trinity's best interests. With respect to § 43-292(6), the State alleged that Charles had failed to fully and consistently participate in visitation, successfully complete a batterers' class and a parenting class, complete a full-scale psychological evaluation and an updated chemical dependency evaluation, complete a budget, consistently submit to random drug testing, consistently abstain from alcohol and/or other controlled substances, and that despite the services offered, he had failed to correct the conditions leading to Trinity's removal.

A termination hearing was held before the juvenile court on June 22 and 24, 2022. The State presented testimony from Trinity's grandmother (her current foster mother), a visitation worker and a visitation supervisor, a Department supervisor, and a drug testing supervisor. Charles testified in his own behalf. The court received various documentary exhibits into evidence.

During this case, Charles was incarcerated from October 2019 to January 2021 following his felony conviction for welfare fraud (buying and selling of "SNAP benefits"). Charles was previously incarcerated for about a year and a half between 2014 and 2015 for receiving stolen property, and he has served time in jail on multiple occasions "going back years."

Charles has had multiple medical issues during this case. In February 2019, he was shot while driving. One bullet struck his face and a second bullet entered his lower back. He was hospitalized between February 4 and April 1 and underwent six surgeries. For some period, he "had a trach placed due to breathing issues," and he underwent physical therapy. Four days after his release from the hospital for the shooting, Charles was stabbed by Shuree (part of the domestic violence incident that led to the children's removal). And, Charles suffered injuries in two different vehicle accidents, the first in May 2021 and the second in July. In May, Charles was the passenger in a vehicle that was struck from behind, and he sustained a broken leg and broken foot. He also aggravated the back injury he sustained during the shooting. He was hospitalized for one day. In July, he was driving, when the brakes on his vehicle failed. He jumped out after failing to maneuver the vehicle to a stop, and the vehicle rolled over his foot, breaking it. He was prescribed pain medication following the shooting, but after overusing those medications, he has used "edibles" and "cannabis oil" as alternatives to relieve his symptoms of ongoing chronic pain.

Jacob Streittmatter, a Department case manager and supervisor, testified about Charles' compliance with the juvenile court's orders, indicating that the conditions that led to Trinity's removal have not been corrected. Streittmatter was the case manager for the family from June 2019 until the case was transferred to another case manager in December 2021. Streittmatter supervised the other manager for 7 months before the case was transferred back to him. Streittmatter noted Charles' inconsistent progress in completing his case plan following his release from incarceration in January 2021 that led the State to file the first motion for termination of Charles' parental rights in May and then the dismissal of that motion, after which Charles again stopped making progress. Streittmatter testified further that between January and May, Charles made "good progress." Charles was participating in visitation, engaging with case management on a weekly basis, was completing his parenting class, and generally seemed motivated to work on his case plan. His level of participation changed, however, around the time of his vehicle accident in May 2021.

Streittmatter testified about Charles' communications with him and the case manager Streittmatter supervised. That individual had contact with Charles by phone call and text message once a month. During the times Streittmatter was the case manager again, he tried to maintain contact with Charles three times a month, also by phone call and text. While Charles was incarcerated, however, Streittmatter sent him letters. Charles did not respond until 1 or 2 months prior to his release, at which time he contacted Streittmatter about setting up services. After Charles' release, Streittmatter had some difficulty contacting Charles because he would not let Streittmatter know when his phone number had changed.

Charles did not successfully complete the requirement of his case plan to abstain from drugs and alcohol, which was monitored through urinalysis testing. Charles told Streittmatter that

he was using cannabis oils for his medical conditions. When Charles did test, the test was positive for THC. Charles never provided verification that he was only using cannabis oil and not marijuana. Charles' failure to complete this requirement concerned Streittmatter and impacted his opinion about Charles' fitness because Charles "hasn't shown . . . that he can have negative drug UA screens," so he "could be under the influence if he's caring for his child."

Further testimony about Charles' compliance with drug testing was provided by Sarah Valentine, a supervisor with the drug testing provider for Charles (between July and October 2021 and again between March and May 2022). She testified that Charles only completed two of the 33 drug tests offered to him. Charles completed those two tests in August 2021. She noted only two documented conflicts during the periods her employer provided service to Charles, once when Charles was positive for COVID-19 and the other when he had a conflict with one of the workers over the phone. Charles was discharged unsuccessfully by the provider in October 2021 and again in May 2022. The provider generally discharges clients after 30 consecutive days of not testing or no contact. According to Valentine, the provider continued offering its service to Charles longer than normal because "[c]ase management insisted that we had correct contact information and that the client wanted to participate in drug testing." The provider uses an intake form at the first face-to-face contact that informs clients they are responsible to contact the provider with any updates to their phone number and that if their phone is "out of service . . . it would benefit them greatly to call [the provider] daily to see if they are on the drug testing list." An intake form was completed for Charles, and he initialed by the line indicating his responsibility to contact the provider with any new phone numbers. The referrals for Charles both "had phone numbers attached." Because the provider had no contact with Charles from March to May 2022, Valentine agreed that she could not be sure whether the contact number for that period was correct.

As to the court-ordered evaluations and classes, Charles completed a chemical dependency evaluation, a co-occurring evaluation, and a parenting class. He did not complete a full-scale psychological evaluation or a batterers' intervention class. Streittmatter testified that the court-ordered batterers' intervention class is usually a 26-week program and different from the domestic violence class completed by Charles. Streittmatter was concerned about Charles' failure to complete these requirements, especially in light of the domestic violence that led to Trinity's removal.

Charles has had housing throughout this case. He lived with a relative upon his release from incarceration and subsequently obtained his own residence in the fall of 2021. As to income, he "collects disability." Although Streittmatter did not have concerns about Charles' income, Charles never provided him with proof of how much income he was receiving each month. Because Charles never completed a family budget, as ordered, Streittmatter was unable to determine whether he actually had enough income to support a child. Streittmatter was unaware of Charles having any issues with transportation.

Streittmatter and several other witnesses testified about Charles' failure to comply with the supervised visitation requirement of his case plan. During this case, a total of six agencies provided visitation services to Charles, and he was discharged by the first agency due his incarceration and by the remaining agencies due to his lack of participation. Charles' participation was inconsistent prior to his incarceration. When Streittmatter spoke with Charles about visitation in the summer of 2021, Charles told him that he was injured and could not participate due to his injuries, although

he never provided any formal verification as to his injuries. Streittmatter did observe Charles to be "in a cast" when they met. Streittmatter offered Charles the opportunity to participate in videoconference visits, and he did so on a few occasions. The last time Charles had a visitation with Trinity was October 2021. Charles' failure to complete the supervised visitation requirement of the case plan and progress beyond supervised visits concerned Streittmatter because he was unable "to gauge how [Charles] parents."

Samantha Ryan was assigned to supervise visitations between Charles and Trinity in December 2021. Ryan contacted Charles, and they "coordinated [their] schedules" for visits to occur every Wednesday and Sunday from 6 p.m. to 8 p.m. with the first visit set for December 29. On that date, Ryan picked Trinity up and brought her to the location for the visit. After waiting 15 minutes for Charles, Ryan returned Trinity to her foster placement. Ryan testified that she had contacted Charles to let him know they were waiting for him at the visitation center. He responded by text message, saying "that no one reached out to him and that the days that [she] had did not work." Since Charles missed the first visit, Ryan's supervisor "put him on a confirmation," meaning that he had to confirm visits prior to them happening. Ryan testified that they "continued our Wednesdays and Sundays because that's what was agreed upon," and she indicated that she informed Charles of the need to confirm visits. The second visit was set for January 2, 2022, but it did not occur because Charles never responded to the text message Ryan sent him to confirm prior to the visit. According to Ryan, Charles requested a new visitation worker on the case because he wanted visits to occur on a different schedule (2 weekend visits). Ryan's supervisor discharged Charles after he failed to confirm prior to the third visit, which was set for January 5. Ryan was unaware of any medical circumstances that might have affected Charles's schedule, but she testified that if she had been aware of any such circumstances, she would have been able to accommodate them.

Charles Robinson, employed by another one of the visitation service providers, was assigned to supervise visits between Charles and Trinity on March 23, 2022. Supervised visits between Charles and Trinity were supposed to occur twice a week for 2 hours each time. During the period Robinson was assigned to the case, he contacted Charles "[e]ight times" or "[a]t least twice a week," but he did not succeed in scheduling any visits. According to Robinson, there was "something that was always going on, some type of obstacle that was interfering with [Charles] doing the visitation," so they "just never [were] able to coordinate anything." Robinson testified that he was willing to accommodate Charles' schedule, except for Sundays when Robinson attended church. Robinson was unaware of any medical issues with which Charles might have been dealing. He testified that if he had known of any appointments for medical conditions, he would have worked around them and would have accommodated any medical needs Charles might have had during visits. On April 13, Robinson sent a text message to inform Charles that the referral for visitation services would be "terminated temporarily," that he could contact Robinson's supervisor for more information about the termination, and that "if anything changed," he could submit a new referral and Robinson's agency would work with him. Robinson did not have a record of any response from Charles to this message, and Robinson did not know whether Charles ever contacted Robinson's supervisor to reestablish visitation services. Due to Charles' lack of participation and inadequate communication, he was unsuccessfully discharged as Robinson's client on April 27 when the referral terminated.

Trinity's foster mother, her maternal grandmother (the grandmother), provided further testimony about visitation and Charles' interaction with Trinity since her placement with the grandmother in May 2020. Since that time, Charles has only had two in-person supervised visits with Trinity, which occurred in the summer of 2021. The grandmother testified about the cancellation of numerous scheduled visits that have occurred while Trinity has been in her care, with the most recent cancellation being 3 or 4 months prior to trial. According to the grandmother, Trinity initially would become upset or confused when visits were cancelled, but now she does not. Trinity has successfully completed therapy while in the grandmother's care. The grandmother testified that Charles sometimes contacts her directly wanting to visit Trinity, but the grandmother has not allowed unsupervised visits.

Although Charles has not provided the grandmother with any money for Trinity's care, he did purchase a cell phone for Trinity and pays the bill on the phone. The grandmother estimated that Charles calls Trinity on that phone "maybe once a week." Charles will sometimes contact the grandmother and ask if there is anything Trinity needs. Charles provided a Christmas gift of clothing for Trinity in 2021 and also provides clothing items "[m]aybe every other month". The grandmother testified that Charles turned Trinity's phone off approximately 2 weeks prior to trial after the grandmother told him that visits needed to be supervised; he had turned the cell phone back on by the time of trial.

The grandmother testified that Trinity needs love, guidance, and support from a parent for long-term success and that she is not receiving those things from Charles. The grandmother testified further that Trinity needs a father who visits her more than she needs clothes and gifts.

Streittmatter opined that termination of Charles' parental rights was in Trinity's best interests based on the length of time Trinity had been in out-of-home placement, Charles' inconsistency in visitation, despite the provision of alternative methods of visitation such as Zoom, his failure to participate in drug testing and show negative test results, and Trinity's need for stability and consistency.

After the State rested, Charles testified in his own behalf. He testified to the regular care he helped provide for Trinity from her birth and prior to the start of this case.

Charles also testified about his various medical issues and his incarceration during this case. After being shot in February 2019, he was prescribed promethazine-codeine, oxycodone, and hydrocodone. He testified that he continues to have ongoing chronic pain and breathing issues related to his injuries from the shooting, as well as problems with his jaw function.

According to Charles, after being charged with welfare fraud in June 2019, he bonded out and violated his bond by going to South Dakota to visit his grandfather, who was ill. He was arrested again in October (on a warrant for the bond violation) after returning to Nebraska and was then incarcerated until January 2021. He testified that he was unable to complete any classes related to this case while incarcerated because of restrictions in programming at the prison related to the COVID-19 pandemic.

Charles testified about his steps to comply with the court orders in this case upon his release from prison. He discussed the case plan requirements with Streittmatter, and he testified about getting his finances "back in order," signing up for a parenting and a domestic violence class, attending visits with Trinity, and obtaining a chemical dependency evaluation (done through

probation). Charles felt his progress on the case plan was "[g]ood" until his vehicle accidents in May and July 2021.

According to Charles, he became "addicted to" and "co-dependent on" the pain medication he had been prescribed following the shooting. He then began using "marijuana edibles" and "THC edibles," as an alternative way to manage his pain, which resulted in him failing a drug test for his probation officer. After that, he began "taking the THC oils." He testified that, while he has smoked marijuana in the past, he no longer does so because of breathing issues. He testified to applying cannabis oil to various parts of his body for pain relief for his injuries from the shooting and the vehicle accidents, and he acknowledged that its use is illegal in Nebraska. Charles acknowledged only completing two drug tests, which were positive for THC, and not completing any further drug tests for the juvenile court case. Charles was asked when his last use of "marijuana" had been, and he responded that it had been 2 days prior to his testimony. Later in his testimony, Charles confirmed that "cannabis oil" was the only "THC-related product" he was currently using. He acknowledged "smelling like marijuana" when he entered the courtroom, stating that his brother had been smoking marijuana in the car in which Charles was a passenger prior to trial. He denied associating with people who do drugs other than marijuana.

With respect to other components of his case plan, Charles testified about completing both a parenting class and a domestic violence class (which he thought was the same thing as a batterers' intervention class). He also completed a co-occurring evaluation, and he thought he had completed all necessary evaluations for the court at that point. Charles acknowledged he did not complete the outpatient therapy recommended following his co-occurring evaluation or a full-scale psychological evaluation. Charles testified about having difficulty with transportation (he was not supposed to drive while taking some of his prescribed medications and because of a citation related to the second vehicle accident). However, he admitted that he did continue to drive, including driving to meet with Streittmatter. He acknowledged never having completed a budget.

With respect to visitation, Charles acknowledged being discharged by six service providers during this case. He claimed to have last seen Trinity for an unsupervised visit at a birthday party in June 2022. He agreed that the court order only allows for supervised visits. He also acknowledged his lack of consistency in visits has been harmful to Trinity.

On July 27, 2022, the juvenile court entered an order terminating Charles' parental rights. The court found clear and convincing evidence that termination was proper pursuant to § 43-292 (2), (4), (6), and (7) and that termination of Charles' parental rights was in Trinity's best interests. With respect to § 43-292(6), the court found clear and convincing evidence as to all allegations except for the allegations with respect to Charles' failure to complete a parenting class and an updated chemical dependency evaluation (which the State dismissed) and his failure to complete a full-scale psychological evaluation (for which the court found insufficient evidence).

ASSIGNMENTS OF ERROR

Charles asserts that the juvenile court erred in (1) finding that his minor child came within the meaning of § 43-292(2), (4), (6), and (7) and (2) determining that termination of his parental rights was in his child's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Elijahking F.*, 313 Neb. 60, 982 N.W.2d 516 (2022). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

ANALYSIS

*Statutory Grounds.*

Charles asserts that the juvenile court erred in finding that his minor child came within the meaning of § 43-292(2), (4), (6), and (7). Upon our de novo review, we find that the State presented clear and convincing evidence to support termination of Charles' parental rights under § 43-292(7). Proof of one statutory ground is needed for termination, and the record clearly shows that statutory grounds for termination of his parental rights exist under § 43-292(7).

Section 43-292(7) provides grounds for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

Trinity was removed from the care of her mother and placed in the Department's custody on April 8, 2019, and has been in out-of-home placement continuously since that time. A motion to terminate Charles' parental rights was filed on January 27, 2022, at which time Trinity had been in out-of-home placement for 33 months, and by the start of the termination hearing on June 22, 2022, she had been in out-of-home placement for 38 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Charles' parental rights under § 43-292(7) were proven by sufficient evidence.

The juvenile court also found sufficient evidence to support termination under § 43-292(2), (4), and (6), but we do not need to consider whether termination of Charles' parental rights was proper pursuant to those subsections since § 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). However, we will consider evidence relevant to § 43-292(2), (4), and (6) in our analysis of best interests. Generally, when termination of parental rights is sought, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of J'Endlessly F. et al.*, 26 Neb. App. 497, 920 N.W.2d 858 (2018).

*Best Interests and Unfitness.*

Charles asserts that the juvenile court erred in determining that termination of his parental rights was in his child's best interests. Charles argues that the court failed to account for the significant progress he made in completing components of his case plan in light of his "incredibly

difficult health situation." Brief for appellant at 15. He argues that he should have been given additional time to continue his attempt at reunification.

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43–292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). The best interests and parental unfitness analyses in the context of a termination of parental rights case require separate, fact-intensive inquiries, but each examines essentially the same underlying facts. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

The evidence shows that Charles initially made progress toward completing his case plan following his release from prison in January 2021. This progress led the State to dismiss its first motion to terminate Charles' parental rights. Charles has completed some of the requirements of his case plan. He has completed a parenting class, a chemical dependency evaluation, and a co-occurring evaluation. He also completed a domestic violence course, confusing it with the required batterers' intervention course. He has provided some financial support for Trinity in the form of a cell phone for which he pays the bills and some clothing.

Charles has failed to comply with other components of the case plan, including visitation, drug testing, obtaining a full-scale psychological evaluation, and following the recommendations from the co-occurring evaluation. Charles acknowledged that his inconsistency in visitation has been harmful to Trinity. He testified that he did not comply with the drug testing requirement because he knew he would test positive, but such compliance, despite his stated use of cannabis oil and edibles for pain relief, would have revealed whether he was using other illegal substances. His communication with case professionals has been lacking; several witnesses testified to being unaware of whether Charles might have scheduling conflicts or need certain accommodations due to his medical issues.

While we are sympathetic to the personal difficulties Charles has faced during the course of this case, he clearly has not placed himself in a position to have Trinity returned to his care. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). We conclude that the State showed by clear and convincing evidence that Charles was unfit and that termination of his parental rights was in his child's best interests.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Charles' parental rights to his minor child.

AFFIRMED.