IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF LORENZ T.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LORENZ T., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

LORENZ T., APPELLANT.

Filed February 4, 2025.    Nos. A-24-178, A-24-181, A-24-183, A-24-184.

Appeals from the Separate Juvenile Court of Lancaster County: ELISE M.W. WHITE, Judge. Affirmed.

Kristi J. Egger, Lancaster County Public Defender, and Katherine Hoatson for appellant.

Patrick F. Condon, Lancaster County Attorney, and Danielle M. Kerr for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

In four separate cases, Lorenz T. appeals from the order of the separate juvenile court of Lancaster County committing him to the Youth Rehabilitation and Treatment Center (YRTC). The appeals have been consolidated for review and disposition. We affirm.

- 1 -

On July 22, 2022, the State filed a petition alleging that Lorenz, born in October 2008, was a juvenile within the meaning of Neb. Rev. Stat. § 43-247(1) (Reissue 2016) because he had committed "Assault, 3rd degree," a Class I misdemeanor.

At a contested adjudication hearing on October 21, 2022, it was established that on July 5, Lorenz was riding in a vehicle that drove by a woman and he shot her with an Orbeez gun (a splatter type gun that shoots "soft small gelatin balls" or "jellies"). The juvenile court adjudicated Lorenz to be a juvenile within the meaning of § 43-247(1). After the disposition hearing on December 5, the court ordered that Lorenz, age 14 at the time, was to be placed on supervised probation for 9 months. The terms and conditions of Lorenz' probation included, among other things, that he was to "cooperate with all therapeutic treatment, evaluations and services as arranged by [his] parent and supported by probation." He was "not to possess a weapon or a firearm" nor have any "threatening or assaultive behaviors."

On July 27, 2023, the State filed a motion to revoke Lorenz' probation alleging that he violated a condition of his probation in that he had threatening and/or assaultive behaviors. On September 15, pursuant to a plea agreement, Lorenz admitted to the probation violation in the motion to revoke and, in exchange, the State dismissed two separate juvenile cases. The State's factual basis for the plea was the probation violation report stating that Lorenz "had threatening and assaultive behavior towards another youth, and a peace officer"; on March 31, Lorenz "caused bodily injury to another person, [name]"; and on April 7, Lorenz "us[ed] or threaten[ed] to use violence, force and physical interference to a peace officer." The juvenile court accepted Lorenz' admission. A disposition hearing was continued until the matters in two more juvenile cases (JV 23-884 and JV 23-934) could be resolved.

On October 13, 2023, the State filed a petition alleging that Lorenz was a juvenile within the meaning of § 43-247(2) because he possessed a stolen firearm, a Class IIA felony (counts I and II), and "Deliver[ed]; Manufacture[d]; or with Intent to Deliver Controlled Substance, Schedule 1, 2, 3," a Class IIA felony (count III). That same day, the State filed a motion for continued secure detention alleging that Lorenz was currently in secure detention at the Lancaster County Juvenile Detention Center and secure detention of the juvenile was necessary because the physical safety of persons in the community would be seriously threatened. A detention hearing was also held that day. The juvenile court found that there were no less restrictive placements available, and that the physical safety of persons in the community would be seriously threatened without detention. The court ordered probation to investigate possible alternatives to detention, including making any necessary placement/treatment referrals.

On November 13, 2023, pursuant to a plea agreement, Lorenz admitted to the allegation in count I (possession of stolen firearm) and, in exchange, the State dismissed counts II (other firearm charge) and III (drug charge). The State provided the following factual basis for the plea.

> On October 10, 2023[,] at approximately 2:28 a.m., officers located a grey 2012 Honda Odyssey near [address]. Officers observed the black [sic] hatch door open. Officers then

contacted the registered owner, [name]. He then advised there were several firearms stolen from the vehicle. This included a black Savage .308 rifle, a black Ruger .30 -- .380 LCP II, a camouflage SIG Sauer 5.56 rifle, and a black Springfield 9mm XD-S. The serial numbers are known to the officers. Also, a compound bow and arrows were also stolen. On October 12, 2023, officers developed Lorenz . . . as a suspect and a search warrant was obtained for his residence at [address]. During the course of the search, officers located two of the stolen firearms in Lorenz's bedroom. This included a black Ruger and then it also included the black Savage .308 rifle. Officers also located the crossbow in the bedroom in addition to the firearms. . . . [O]ther items that were also . . . found there had also been in the search warrant. . . . [O]utside there was a red dolly that was similar to what was seen in video from somebody carrying bags likely from the vehicle from which the firearms were stolen.

The juvenile court accepted Lorenz' admission and adjudicated him to be a juvenile within the meaning of § 43-247(2); prior orders regarding detention continued in full force and effect. A subsequent disposition hearing was continued until the matter in a separate juvenile case (JV 23-1062) could be resolved.

We note here that the predisposition investigation report shows that in addition to the firearms and crossbow found in Lorenz' bedroom during the search as noted above, law enforcement also found "148 grams of marijuana, a bag containing 49.9 grams of marijuana, and a bag containing 49.9 grams of marijuana." When the probation officer talked to Lorenz about his behaviors, "he just laughs it off and states it's no big deal." A January 3, 2024, assessment by probation officer Kara Wilkinson indicates that on November 28, 2023, she was informed that "Lorenz was the offender in a harassment public indecency." "Lorenz was running towards a youth with an erect penis and carrying something in his hands" that he threw in the trash when he was told to stop; it turned out to be Lorenz' "boxers ripped up." On November 30, Lorenz "exposed his groin and backside to peers." On December 6, Lorenz was cited (JV 23-1062) for "resident to staff assault." On December 24, Lorenz was the "offender in obstruction of correctional operations, resident to resident assault." On December 25 and 27, Lorenz flooded his room. On December 28, Lorenz "threw feces on staff." Staff from the detention center indicated that Lorenz "does not listen and does not follow redirection." If he does not "get his way he will start yelling, cussing, and talking badly to staff." There were "high concerns with his sexual behavior." "He makes very sexual comments" to staff and peers, "runs around naked, shows his privates to female[] peers, and throws his feces at staff members." Wilkinson reported that Lorenz' mother wanted Lorenz to come home and she blamed his behaviors on the staff at the detention center mistreating him.

CASE NO. A-24-183/JV 23-934

On November 13, 2023, the State filed a petition alleging that Lorenz was a juvenile within the meaning of § 43-247(2) because he committed "Theft by Unlawful Taking, $5,000 or more," a Class IIA felony. On December 4, the petition was amended to "Attempt Theft by Unlawful Taking, $5,000 or more," a class IIIA felony. That same day, Lorenz answered "no contest" to the allegations in the amended petition. The State provided the following factual basis for the plea.

On October 11, 2023[,] at 7:39 a.m., [E.T.] discovered her vehicle, a 2022 Lexus GX Sport, was stolen overnight. She stated that the vehicle was taken from her driveway on [street name] and that she left her key fob inside of it. The vehicle was valued at approximately $50,000 and was later recovered at [address]. The next day on October 12, 2023, investigators served a search warrant at Lorenz['] . . . residence at [address] on an unrelated case. During the search, investigators located [an] . . . ID card belonging to [E.T.]. She stated that the ID card was in her vehicle at the time it was stolen. Then on October 13, 2023, a search warrant was executed on Lorenz['] . . . cellphone. Investigators found a video on the cellphone that was taken on October 11, 2023, the day of the auto theft. The video was taken by the driver of the vehicle as they drove through a neighborhood and officers observed the vehicle to be a Lexus by the Lexus emblem that was visible on the steering wheel. Investigators also observed a Snapchat exchange between Lorenz . . . and an unknown party in which Lorenz commented on the Lexus being so big.

The juvenile court accepted Lorenz' admission and adjudicated him accordingly. A subsequent disposition hearing was continued until the matter in a separate juvenile case (JV 23-1062) could be resolved.

CASE NO. A-24-184/JV 24-13

On January 5, 2024, the State filed a petition alleging that Lorenz was a juvenile within the meaning of § 43-247(1) because of "Disturbing the Peace," a Class III misdemeanor. On January 31, pursuant to a plea agreement, Lorenz answered "no contest" to the allegations in the petition and, in exchange, the State agreed to dismiss a separate juvenile case (JV 23-1062). The State's factual basis for the plea was a police incident report stating that an employee at the detention center reported that Lorenz intentionally clogged his toilet and defecated in it, and when the employee was attempting to clear the clog, Lorenz grabbed a piece of feces and threw it at the employee. The juvenile court accepted Lorenz' "no contest" plea and adjudicated him to be a juvenile within the meaning of § 43-247(1).

COMMITMENT TO YRTC

On December 1, 2023, the State filed a "Motion for Commitment to [YRTC]" in A-24-178/JV 22-694 and A-24-181/JV 23-884. The State alleged that the following community-based services, interventions, and/or placements had been ordered, used and/or offered to the juvenile: out of home placements including referrals for shelter and group homes, evaluation(s) and assessments, individual therapy, probation facilitated group(s), mediation, and electronic monitoring services. The State further alleged that all levels of probation supervision and options for community-based services had been exhausted or that there was not a reasonable possibility of success with other levels of supervision or community-based corrections, and that commitment to the YRTC was a matter of immediate and urgent necessity for the protection of the juvenile or the person or property of another or it appeared that the juvenile was likely to flee the jurisdiction of the court.

On February 5, 2024, the State filed a "Motion for Commitment to [YRTC]" in A-24-183/JV 23-934 and A-24-184/JV 24-13. The State made the same allegations as in the

motion filed on December 1, 2023, except that the State included additional community-based services, interventions, and/or placements that had been ordered, used and/or offered to the juvenile (i.e., day reporting, evening reporting, and tracker services).

A consolidated disposition hearing in all four cases was held on February 9, 2024. Several witnesses testified and exhibits were received into evidence.

Wilkinson was Lorenz' juvenile probation officer after the assault charge in A-24-178/JV 22-694 (July 2022 incident), and a separate truancy case that was successfully closed. She stated,

I received the case from another PO who had left. . . . [W]hen I met with Lorenz and his mother in my office, he was doing good on school 'cause he was homeschooled so that closed successfully. I said due to the assault charge which had I think four or five months to go, I said we'd go a couple more months and then we'd close that one.

However, during that time frame, Lorenz got another charge, and Wilkinson filed a probation violation in the assault case.

After the probation violation, no services were put in place. Wilkinson stated, "Talking with Mom, he was doing well in the home, he was doing -- he had just started [at a school in the fall of 2023] so we were seeing how that was going, so services were not needed." Wilkinson confirmed that prior to the fall of 2023, Lorenz was not in a school environment, so his mother was the only source of information about how Lorenz was doing, and that was part of the reason why there were no red flags that other services were needed. Lorenz' mother did not ask for any services, nor did she report any issues with Lorenz in the home. However, there was a school meeting on September 29 due to Lorenz' behaviors in school. "He was skipping, he had his phone out, he would not put it away, and the school had concerns about him smelling like marijuana. He'd get up and leave school, they implemented random searches, he was cussing, he wouldn't be in class, he'd be in the gym playing basketball." After the school meeting, Wilkinson talked to Lorenz. "I don't think . . . I offered services, we were going to kind of see how it went at school to see if the checking in the phone, the random searches was gonna work"; "I received an email from the school on October 2nd, October 3rd, and October 11th with continued behaviors, but then I detained him on the 12th so there was really no time to put any services in" because "[i]t happened very rapidly."

Wilkinson detained Lorenz after she "got a call from LPD" on October 12, 2023, that stolen property and a gun were found in his home. As far as looking for less restrictive placements, Wilkinson and Lorenz' mother talked about his grandparents. However, Lorenz' maternal grandfather told Wilkinson to talk to his partner, and Wilkinson said the partner had concerns and determined that it would not be a good place for Lorenz. Wilkinson did not speak to Lorenz' maternal grandmother.

Wilkinson then sent out referrals for out-of-home placements to Omaha Home for Boys, Boys Town, and Heartland, but she received denials from all three due to Lorenz' current assault charges and his noncompliance in detention. She also sent a referral to Cedar's for shelter care, but "Cedars denied due to the charges." Wilkinson was asked, "[I]f the reason for the denial is due to the charges, resending referrals . . . is there typically a chance that that would change or get a different response?" Wilkinson replied, "No." Wilkinson's supervisor sent out-of-state referrals to five locations.

Wilkinson confirmed that during the 9 months she was Lorenz' probation officer, no services were put in place.

Rae Sallae became Lorenz' probation officer on approximately January 4, 2024, because Lorenz needed a higher level of supervision. Sallae did not personally send out any referrals, but said the previous probation officer, Wilkinson, did; it was Sallae's understanding that Lorenz was denied at "all in-state and out-of-state group and shelter level of care." She explained that the denials were due to his "history of physical and verbal aggression as well as his behavior while he was detained." Sallae confirmed that Lorenz had been on probation for over a year prior to his current detention. Sallae had not received any major discipline referrals from detention since January 9, 2024, but Lorenz continued to have "some minor infractions with boundaries and with his peers." Sallae testified that "probation recommends placement at the YRTC in Kearney."

Sallae stated, "At this time, no services have been implemented due to the lack of cooperation that was attempted previously." Sallae believed that a community youth coach and a family support worker were attempted, but they were not successful. Lorenz had not been on an electronic monitor and no kinship placement had been tried. "MST" was previously offered, but the family was not in support of it at the time. According to Sallae, MST involves meeting with the family in the home for an hour twice a week for about 16 weeks. It has two components; "They do the individual therapy with the youth and then they also have a family component where they work with the parent to help provide additional support and skills to help provide additional support for the youth." Sallae said that probation did not have any information from MST that they were not willing to accept Lorenz. However, Sallae reiterated that probation did not believe community services would be appropriate "at this time due to Lorenz's history of negative behaviors."

Sallae stated that probation arranged an evaluation for Lorenz in order to obtain more information regarding safety concerns and appropriate services, and Denise Barrow did a cooccurring evaluation of Lorenz on January 17, 2024. (Barrow did not testify at the hearing; but an exhibit received into evidence reveals that her recommendations for Lorenz included individual outpatient therapy with a dually competent trauma focused therapist to address both mental health and substance use, random UAs, part-time employment and/or pro-social activity, a skills development group, and in-home services focused on skills development as arranged by probation.) It was Sallae's understanding that the evaluation would deal with "what the appropriate services would be, not really with safety concerns." Sallae confirmed that at the time of the evaluation, she had expressed to Barrow that Lorenz had not been given the opportunity to try services in the community and that he should be given a chance with services. Sallae's recollection was that one of Barrow's recommendations was in-home services for Lorenz. However, probation was not in agreement with Barrow's recommendation "due to the listed reasons I had included in the [predisposition investigation]."

In a "Juvenile Supervision Report" authored by Sallae for the reporting period from January 4 to 29, 2024, she noted that Lorenz was involved in a physical altercation at the detention center on January 9. Sallae reported that "[b]ased on information received from detention staff, Lorenz still struggles with keeping his hands to himself, has difficulties with boundaries and uses inappropriate language towards staff and peers." Lorenz and his mother requested that Lorenz be allowed to return home on an electronic monitor. But when asked what parental supervision would

look like if Lorenz returned home, his mother "did not provide details" and said only that she was "'very busy' between working and taking care of her other children." Sallae reported that Lorenz' mother "works out of town and is unable to provide consistent parental supervision." Sallae indicated that probation "is not in agreement with recommendations" from the cooccurring evaluation due to Lorenz' "serious law violations, history of physical and verbal aggression, community safety, and pending charges since being detained." Further, Lorenz had been "denied at all group homes and shelters, both in and out of state." "Based on information received from Lorenz' previous probation officer, probation made efforts to implement services, however, no services were started due to lack of cooperation from Lorenz and [his mother]." Therefore, the "severity of Lorenz's offenses and the significant tendency towards aggressive behaviors warrants the highest level of care [in] that Lorenz's behaviors pose significant risks to community safety."

Sallae testified that in the most current update, Lorenz was identified in the high-risk range on the "YLS/CMI scale." She confirmed that Lorenz had recently moved from moderate to high-risk on the family and relationships portion, even though family and support in the community was listed as an area of strength; and he was marked as a high-risk for school, even though under strengths it said that he had been attending school daily.

When asked about the status of Lorenz' in-home referrals at this point, Sallae responded, "[L]orenz is currently on the waiting list for MST" and probation did not have any information from MST that they are not willing to accept Lorenz. For "MST" and "IFP," the soonest that services could be available within the home is "somewhere in the April, end of April time frame," "and then CYC would be two to three weeks, and [a] family support worker could start fairly soon within a week or so." Sallae was then asked why, if Lorenz had been detained since October 2023, he had not moved up on these lists. She responded, "So at one point in time, based on my understanding, . . . due to the pending adjudication charges, services were being paused at the time to get to . . . a final outcome of what would be the court's decision as far as what would be in Lorenz's best interest."

Sallae reiterated that "probation believes community services would not be appropriate at this time due to Lorenz's history of negative behaviors." Sallae was asked, "[I]s . . . part of that concern from the fact that the group home level of care has decided they can't meet his needs and they're more of an intensive service than MST and family support?" Sallae responded, "As far as them being more intensive or how intensive, it differs from placement, however, yes, they are not able to meet Lorenz's needs at this time due to circumstances in his case."

According to Sallae, probation was currently recommending placement at the YRTC in Kearney. When asked if there were any other services available in the community that would have a reasonable likelihood of success for Lorenz, Sallae responded, "From a probation standpoint, no, there [are] not other services in the community that we believe would be appropriate at this time." She confirmed that it was probation's position that they had exhausted all levels of probation supervision and options for community-based services and that there was not a reasonable possibility of success with other levels of supervision or community-based services. It was her position that a commitment to the YRTC was a matter of immediate and urgent necessity for the protection of the juvenile or the person or property of another or that it appeared that the juvenile was likely to flee the jurisdiction of the court.

The affidavit of Sara Thomas, clinical program director for the YRTCs, was received into evidence without objection. In her affidavit, Thomas explained how the YRTC program worked. After arrival at the YRTC, the juvenile undergoes mental health and substance use evaluations and assessments and behavioral screenings, all of which are used to develop an individualized plan of care. The juvenile is subsequently assigned to the most appropriate therapist to meet their individual needs. Educational opportunities are also available at the YRTC. The juvenile is allowed in person and WebEx visitation with their approved visitors. Families are included in monthly family team meetings. Monthly progress letters are sent to the court, legal parties, and the juvenile's parents. The YRTC evaluates whether a juvenile has reached maximum benefit and is ready for discharge by reviewing the progress letters and therapy treatment plan, and it also considers whether the juvenile poses any current risk to the community if released.

Lorenz' mother testified that Lorenz lived with her prior to his detention. He was never involved in any in-home services. He never had a family support worker, a community youth coach, "MST" services, or one-on-one therapy, nor had he ever been on an ankle monitor. When asked if she thought those things could help Lorenz, his mother answered, "Yes." She was willing to have Lorenz back in her home and she would comply with any in-home services ordered by the juvenile court. She believed that would be best for Lorenz because "where he's at right now is affecting his mental health" and "[m]y other sons are no longer in the home so it's just my daughter and I, and . . . I have more time to focus on helping Lorenz." The mother's work schedule was "flexible" because she works for herself, and "it's never longer than like a four-hour increment Monday through Friday and during the day when he would be in . . . class." She believed that Lorenz would be successful in her home.

If Lorenz' mother had to be away from home for any reason, Lorenz could stay with his maternal grandfather, his maternal or paternal grandmothers, or his maternal aunt. Lorenz' mother stated that she and Lorenz "don't see [his maternal grandfather] a whole lot but he's just a supportive grandpa" and "[h]e's there whenever we call him." Lorenz and his maternal grandmother "have always had a really good relationship" and "she's actually tutored him for school and also they do a lot of cooking together." Lorenz' maternal aunt was "kinda like a second mom to him." Lorenz' mother had no concerns about Lorenz respecting the rules of those family members because he "loves his family" and "he doesn't want to disappoint them."

On cross-examination, Lorenz' mother stated that she never asked probation for help to set up therapeutic services for Lorenz after he was placed on probation "because he wasn't having problems in the home," "[i]t was outside of the home that it seemed like there was problems, not at home, so I wasn't seeing what other people were seeing at that time." "[A]t home he was respectful, he was doing everything he needed to do at home."

Lorenz' mother confirmed that she was at the school meeting on September 29, 2023, referenced by Wilkinson, and was informed about the school's concern that Lorenz smelled like marijuana. When asked if she had concerns about marijuana usage, she responded, "Yes, after that conversation I did." When asked what steps she took as a parent, she replied, "[T]here was nothing," "[h]e said that he wasn't using marijuana" and "[t]hey never found any marijuana on him, so I had a conversation with him and that was the end of it." She never searched his room. Lorenz' mother confirmed that the stolen firearm was found in Lorenz' room.

Lorenz' mother was asked if she had a pending assault charge from September 2023 regarding an incident at the school when she picked up one of her other sons. She responded, "I do, where the teacher sprang me, yeah, I have that pending assault charge, I do but I'm gonna beat that case."

Lorenz' maternal grandmother testified that her interactions with Lorenz had been "[g]ood, he's never been anything but respectful." She said that they watch football games together and cook. She confirmed that she would be willing to let Lorenz stay with her. When asked if she had any unique experience that would help Lorenz be successful in school, she responded, "I went to school to be a teacher, so secondary math education," and "I can help him with his homework." She confirmed that she would be willing to engage with therapeutic services if they were put in her home to help Lorenz be successful. She believed that Lorenz had the ability to be successful in her home because, "I work from home so I could be here for him 24/7 whatever he might need."

Lorenz' maternal grandfather testified that he and Lorenz "get along pretty good." He would be willing to let Lorenz live with him "as long as he was behaving himself." When asked if he believed that Lorenz had the ability to be successful in his home, the grandfather replied, "Sure," "I think he has the ability to be successful any place . . . if he puts his mind to it." The grandfather was willing to be a support to Lorenz while he was rehabilitating in the community. On cross-examination, the grandfather was asked if he had observed anything prior to Lorenz' arrest that caused him concerns about Lorenz using substances. He responded, "Oh, yeah," "he's surrounded by it, I mean, his friends, his family, . . . I mean, when you grow up in that environment, you know, you're exposed to it, yes." On redirect, the grandfather stated, "I'm sure he's using marijuana," "I don't know anybody that hasn't really, I mean it's every place. I mean, I can buy it right up the street from where I live at a dispensary." Upon further questioning by the court, the grandfather clarified that he had no personal knowledge of Lorenz using marijuana and had never seen him smoke marijuana.

Probation officer Sallae was recalled as a witness. She was asked if probation was in support of placements with any of the family members who testified that they were willing to take placement of Lorenz. Sallae responded, "At this time, probation is still in recommendation to the YRTC" "[d]ue to Lorenz's history of verbal and physical aggression, his adjudicated . . . law petitions, as well as his behaviors . . . in the detention which really gives us a concern that he poses a community safety risk." While in detention, there had been reports of Lorenz' behaviors, either major infractions or minor. When asked if she was concerned that if Lorenz was having those kinds of behaviors in a controlled setting that he would have those kinds of behaviors back in a school setting as well, Sallae responded, "Yes." Sallae confirmed that Lorenz' most serious charge dealt with the possession of a stolen firearm. She also agreed that the firearm was found in the family home and that a monitor could not prevent somebody from possessing a firearm in their own home. Upon further questioning by the court, Sallae confirmed her belief that placing Lorenz back at home would be a risk to the community even with the services probation had to offer.

The juvenile court entered an order in all four cases on February 12, 2024, granting the State's motion for commitment to the YRTC. The court found that all levels of probation supervision and appropriate options for community-based services had been exhausted, and placement of Lorenz at the YRTC was a matter of immediate and urgent necessity for the protection of such juvenile or the person or property of another. It stated:

The court acknowledges that evidence was presented regarding various less restrictive options for placement of Lorenz . . ., including his mother's home, his grandmother's home, and his grandfather's home. The court also acknowledges that various services could be available to Lorenz . . . in the community, including individual therapy, MST/IFP services, community youth coaching, electronic monitoring and family support. While a less restrictive placement and services in the community may be available, the evidence presented indicates that Lorenz . . . continued to display aggressive, assaultive and destructive behavior while he was in secure detention. The court further finds that the testimony of his mother was not credible and caused the court to have concerns regarding the ability of his mother or other caregivers identified as possible placements to adequately supervise Lorenz . . . safely in the community. The court does not find, based on the evidence presented, that lower levels of probation supervision or community-based services would have a reasonable possibility of success. The court further finds that Lorenz . . . continues to pose a risk of harm to members of the community and the plan for less restrictive placements than detention proposed through his counsel, does not adequately provide for measures to protect members of the community. Accordingly, the Court finds that the State has met their burden of proof herein and that the Motion for Commitment to [YRTC] should be and hereby is sustained.

The court placed Lorenz on "intensive supervised probation" for the period of his minority, "unless he is discharged from probation by the Court prior thereto."

Lorenz appeals.

## ASSIGNMENTS OF ERROR

Lorenz assigns that the juvenile court erred in finding (1) all levels of probation supervision and all options for community-based services had been exhausted and that placement at a YRTC was a matter of immediate and urgent necessity for his protection or the person or property of another, and (2) juvenile probation thoroughly considered available services and that the available placements did not have a reasonable chance of success.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Elijahking F.*, 313 Neb. 60, 982 N.W.2d 516 (2022).

## ANALYSIS

Neb. Rev. Stat. § 43-286 (Supp. 2023) states in relevant part:

(1) When any juvenile is adjudicated to be a juvenile described in subdivision (1), (2), or (4) of section 43-247:

. . . .

(b) When it is alleged that the juvenile has exhausted all levels of probation supervision and options for community-based services and section 43-251.01 [restrictions

on placements and commitments] has been satisfied, a motion for commitment to a youth rehabilitation and treatment center may be filed and proceedings held as follows:

. . . .

(iii) The juvenile shall be entitled to a hearing before the court to determine the validity of the allegations. At such hearing the burden is upon the state by a preponderance of the evidence to show that:

(A) All levels of probation supervision have been exhausted;

(B) All options for community-based services have been exhausted; and

(C) Placement at a youth rehabilitation and treatment center is a matter of immediate and urgent necessity for the protection of the juvenile or the person or property of another or if it appears that such juvenile is likely to flee the jurisdiction of the court;

(c) After the hearing, the court may, as a condition of an order of intensive supervised probation, commit such juvenile to the Office of Juvenile Services for placement at a youth rehabilitation and treatment center operated in compliance with state law.

Section 43-286 requires that before a juvenile is placed in the YRTC, the Office of Probation Administration must review and consider thoroughly what would be a reliable alternative to commitment at YRTC. *In re Interest of Nedhal A.*, 289 Neb. 711, 856 N.W.2d 565 (2014).

The Legislature intended the placement of a juvenile at the YRTC to be a last resort. *Id.* Upon reviewing the juvenile's file and record, the Office of Probation Administration shall provide the court with a report stating whether any such untried conditions of probation or community-based services have a reasonable possibility for success or that all levels of probation and options for community-based services have been studied thoroughly and that none are feasible. *Id.* The Nebraska Supreme Court stated, "We do not imply that a juvenile court must ensure that every conceivable probationary condition has been tried and failed before it may place a juvenile at YRTC." *Id.* at 716, 856 N.W.2d at 569. The review should consider the success or failure of prior supervisory conditions, even if the conditions were imposed by some other agency responsible for the child's care. *Id.*

In considering whether the State has shown that a juvenile should be placed at a youth rehabilitation and treatment center, a juvenile court is not required to repeat ineffective measures or to provide services that were previously proved to be unsuccessful. See *Id.* A juvenile's placement at the YRTC is "premature" when there has not been a "thorough review of all levels of probation that could be applied." *Id.* at 716, 856 N.W.2d at 569. "[T]he record must establish that all levels of probation and options for community-based services have been thoroughly considered before the court may commit [the juvenile] to YRTC." *Id.* at 717, 856 N.W.2d at 570. See, also, *In re Interest of Alan L.*, 294 Neb. 261, 272, 882 N.W.2d 682, 690 (2016) (affirming juvenile's placement at YRTC; probation report must show whether "untried conditions of probation or community-based services had a reasonable possibility for success or were unfeasible"; juvenile court could only reasonably conclude that placing juvenile in his home, a group home, or more structured environment would result in endangerment to himself or others).

Lorenz argues that the juvenile court erred when it found that all levels of probation supervision and options for community-based services had been exhausted because "no in-home

or out-of-home services were ever tried, and several placements and services were available that were consistent with the recommendations of a recent co-occurring evaluation." Brief for appellant at 17. "Lorenz was detained for the very first time, never released, never received any services, and was subsequently ordered to the highest-level facility, skipping all exhaustion requirements." *Id.*

However, as pointed out by the State, while there may have been untried services, probation studied and considered "all levels of probation and options for community-based services," but "none [were] feasible." Brief for appellee at 10. It points out that after Lorenz was placed on 9 months' probation for the assault offense (with splatter gun), he remained at home under the supervision of his mother and juvenile probation officer Wilkinson. The terms of his probation required him to "cooperate with all therapeutic treatment, evaluations and services as arranged by [his] parent and supported by probation." However, no requests for services were made by Lorenz' mother. In July 2023, a motion to revoke probation was filed due to Lorenz' threatening behavior towards another youth and a peace officer.

In the fall of 2023, Lorenz started attending an area high school, and by the end of September, there were reports of him skipping class, being on his phone, playing basketball in the gym instead of being in class, cussing, and smelling like marijuana. When Lorenz' mother was asked what steps she took as a parent in response, she replied that Lorenz said that he was not using marijuana and "[t]hey never found any marijuana on him, so [she] had a conversation with him and that was the end of it." She never bothered to search his room. In October, stolen firearms and marijuana were found in Lorenz' bedroom. He also stole a vehicle. He was then placed in detention, where he engaged in public indecency, assaulted a staff member, flooded his room on two occasions, and "threw feces on staff." He was involved in a physical altercation on January 9, 2024, at the detention center, and staff reported that "Lorenz still struggles with keeping his hands to himself, has difficulties with boundaries and uses inappropriate language towards staff and peers." It was reported by detention staff that Lorenz did not listen or follow redirection and there were concerns about his "sexual behavior." Lorenz' mother blamed his behaviors on the detention center staff mistreating him. And when Lorenz' mother was asked what parental supervision would look like if Lorenz returned home, she did not provide details and said only that she was "'very busy' between working and taking care of her other children."

Probation sent referrals to in-state and out-of-state homes and shelters, but all were denied due to Lorenz' pending charges and noncompliance while in detention. Sallae believed that a community youth coach and a family support worker were attempted, but were not successful, and that MST services were offered but the family was not in support of it at the time. And regarding possible kinship placements, Sallae indicated that probation recommended the YRTC because of Lorenz' history of verbal and physical aggression, as well as his behaviors in detention which caused concern that Lorenz posed a community safety risk. Sallae also pointed out that firearms were found in the family home and that a monitor could not prevent that. It was Sallae's position that placing Lorenz back at home would be a risk to the community even with the services probation had to offer.

The juvenile court specifically acknowledged the existence of various less restrictive options for placement of Lorenz, including his mother's home, his grandmother's home, and his grandfather's home. It also acknowledged various services in the community, such as individual

therapy, MST/IFP services, community youth coaching, electronic monitoring, and family support. But despite less restrictive placement and services in the community being available, the juvenile court found that the evidence demonstrated that Lorenz "continued to display aggressive, assaultive and destructive behavior while he was in secure detention." The court also found the testimony of Lorenz' mother was "not credible and caused the court to have concerns regarding the ability of his mother or other caregivers identified as possible placements to adequately supervise Lorenz . . . safely in the community." The court also could not find that "lower levels of probation supervision or community-based services would have a reasonable possibility of success" and that Lorenz "continues to pose a risk of harm to members of the community" and less restrictive placements do not "adequately provide for measures to protect members of the community." It therefore concluded that it was a matter of immediate and urgent necessity to place Lorenz at the YRTC for the protection of the juvenile or the person or property of another.

Based upon our de novo review of the record, we agree with the juvenile court's assessment that while other alternatives may have existed, there were no feasible options for a less restrictive placement. And, as stated in *In re Interest of Nedhal, supra*, not all services need to be tried and failed before a juvenile can be placed at the YRTC. Lorenz is now 16 years old. His "aggressive, assaultive and destructive" behaviors endanger himself and others, and without significant correction, he may soon find himself facing much harsher and longer-term consequences in an adult criminal court. According to Thomas, the YRTC will provide mental health and substance use evaluations and assessments and behavioral screenings, all of which are used to develop an individualized plan of care. Importantly, these services will take place in a secured environment. The preponderance of the evidence supports that all feasible levels of probation supervision and options for community-based services have been exhausted, and Lorenz' placement at the YRTC is a matter of immediate and urgent necessity for his protection or the protection of the person or property of another.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's February 12, 2024, order committing Lorenz to the YRTC.

AFFIRMED.